ALNA CAPITAL ASSOCIATES, et al.,
Plaintiffs-Appellees,

v.

William WAGNER,
Defendant-Appellant.

No. 83–5143.

United States Court of Appeals,
Eleventh Circuit.

April 19, 1985.

Rehearing Denied May 22, 1985.

Patricia M. Silver, Bernard S. Mandler, Miami Beach, Fla., for defendant-appellant.

Daniel Neal Heller, Miami, Fla., Robert Golden, Sebastion, Fla., for plaintiffs-appellees.

Before HILL, KRAVITCH and SMITH[*], Circuit Judges.

JAMES C. HILL, Circuit Judge:

Defendant-appellant William Wagner appeals the order of the United States District Court for the Southern District of Florida, 532 F.Supp. 591, finding that he committed securities fraud under section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5, section 517.301 of the Florida Statutes, and Florida common law, and awarding $62,336.40 in damages to plaintiffs-appellees. We affirm, except with regard to the damages assessment, which we reverse and remand.

## FACTS

Appellee Alna Capital Associates, a limited partnership of which appellee Albert Nahmad is the general partner,[1] bought approximately thirty-eight percent of the outstanding shares of Watsco, Inc. ("Watsco"), from appellant, William Wagner, who was then president and chairman of the board of Watsco. The parties intended to base the purchase price on the expected yearly earnings per share, finally agreeing upon a purchase price of $8.00 per share.

Subsequent to the closing, Nahmad's accountants prepared the annual financial statements of Watsco, and found a fourth quarter loss. They determined that a restatement of the prior three quarterly reports, which Watsco had filed with the Securities Exchange Commission, was necessary to reflect accurately Watsco's financial condition. Under the restatement, quarterly earnings dropped significantly. The restatement was filed with the Securities Exchange Commission and, once publicly announced, the value of market shares dropped from about $8.00 to about $4.00. Shortly thereafter, Nahmad became aware of antitrust problems encountered by the Winslow Division of Watsco, and difficulties in obtaining a patent for and the operation of "Chargefaster," a refrigeration product manufactured by Watsco. Appellees then brought this security fraud action against Wagner, claiming that he fraudulently misrepresented and withheld material information in connection with the stock sale. In a bench trial, the district court found for the appellees.

The appellees alleged, and the district court found, basically three categories of misrepresentations and omissions: (1) misstatements in some of the quarterly earnings statements that Watsco originally filed with the Securities Exchange Commission; (2) misstatements and omissions concerning the operation and patent status of Chargefaster; and (3) misstatements and omissions regarding distributorship agreements entered into by the Winslow Division. The trial court found that these misrepresentations and omissions concerned information material to the sales transac-

---

[*] Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. Alna Capital Associates succeeded the other appellee Alna Capital, Inc., a closely held corporation composed of the same investors as Alna Capital Associates.

tion, that the appellees relied on the misrepresentations and omissions, and that the scienter requirements of rule 10b–5, Florida's securities fraud statute and the Florida common law were met. The trial court rejected appellant's claims that appellees were not sufficiently diligent in investigating Wagner's representations, and that section 10b and rule 10b–5 did not apply to this sales transaction.

On the question of damages, the court pointed out that the measure of damages was the difference between the price paid for the securities and the value the securities would have had absent the misrepresentations and omissions. The judge determined that the sale price was reached by using a multiple of 12.5 times the projected yearly earnings of approximately .65¢ per share. The court determined that, had the quarterly financial reports been stated ac-

curately, the projected yearly earnings would have been approximately .53¢ per share. The court also found that knowledge of the true state of affairs regarding the Winslow distributorship contracts and the operation and patent status of Chargefaster would have been likely to reduce the fair market value of the shares by an additional .06¢ per share. Having arrived at these figures, the judge did the necessary mathematical calculations, and found appellees' damages to be $62,336.40.

## DISCUSSION

■ Appellant argues that neither section 10(b) nor the Florida securities statute applies to this transaction.[2] While we seriously doubt that section 10(b) and rule 10b–5 apply to a sale of the sort involved here,[3] we need not, and thus do not, decide

2. According to appellant, coverage of the Florida securities statute mirrors coverage of the federal securities laws, and thus if section 10(b) and rule 10b–5 do not apply, neither does the Florida statute.

3. Section 10(b) and rule 10b–5 apply to "the purchase or sale of any security." 15 U.S.C. 78j(b) (1982); 17 C.F.R. § 240.10b–5 (1984). In *King v. Winkler,* 673 F.2d 342 (11th Cir.1982), this circuit rejected the literal interpretation of section 10b and rule 10b–5 adopted by the Second and Fourth Circuits, which hold that they apply to *all* transactions involving the purchase or sale of stock. *Golden v. Garafalo,* 678 F.2d 1139 (2d Cir.1982); *Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979). We, instead, joined the Seventh Circuit in holding that even though stock is involved in a transaction, section 10(b) and rule 10b–5 apply only if the parties intended the transaction to be an investment in and not a purchase of a business. *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981). We reasoned that Congress intended for the securities laws to protect investors, not purchasers, and thus intended for the laws to apply only to those stock transactions that were entered into for investment purposes. So viewing congressional intent, we determined that the crucial question in regard to the application of 10b should not be whether stock was involved, but rather whether *the parties intended this to be an investment* transaction or a sale of a business. To determine that intent, courts are to examine the "economic realities" of the situation. Under this "economic realities" test (or "sale of busi-

ness" rule, as some have termed it), a stock transaction is an investment if: (1) it is an investment in a common venture; (2) it is premised on a reasonable expectation of profits; and (3) the profits are to be derived from the entrepreneurial or managerial efforts of others. *King,* 673 F.2d at 344. Applying this test to the facts in *King,* we found that a sale of 100% of the stock of a closely held corporation to purchasers who intended personally to manage the business failed to satisfy the third requirement, and so was a sale of a business, not an investment. *Id.* at 344–45.

The facts of *King* are different from those of the instant case, which involves the sale of approximately 38% of the stock of a public corporation. Nevertheless, it is not at all clear to us, given our reasoning in *King,* that the fact that a publicly held corporation is involved here is a relevant distinction. *Cf. Zilker v. Klein,* 510 F.Supp. 1070, 1075 (N.D.Ill.1981) (purchase of all the stock of a publicly held corporation was not an investment). Nor is it clear to us that the fact that less than 100% of the stock was purchased is a controlling distinction. We explicitly stated in *King,* 673 F.2d at 346, that "the approach used here is not a function of numbers. A sale of less than 100% of the stock might not be covered by the Acts. A sale of 100% of the stock can be covered . . . ." According to the court, "each case must be evaluated on its own facts to determine if the transaction, though within the letter of the statute, is not within its spirit nor the intent of the lawmakers." *Id.* We think the facts of the instant case strongly suggest that appellees, who purchased a controlling interest in Watsco, intended to make money through their own efforts, and that this was a purchase, not an investment.

the issue. For even if we were to hold that the federal and state securities statutes do not apply, we would retain federal jurisdiction, *see Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946),[4] and could affirm the district court's order based solely on its findings regarding the pendent state claim of common law securities fraud, *see Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Garner v. Pearson,* 732 F.2d 850, 854 (11th Cir.1984),[5] the elements of which are, for all relevant purposes, identical to those of federal and Florida statutory securities fraud.[6]

Appellant also argues that the district court should be reversed because its factual findings supporting its judgment of liability for securities fraud are clearly erroneous. Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.,* 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–542, 92 L.Ed. 746 (1948); *Hardin v. Stynchcomb,* 691 F.2d 1364, 1372 (11th Cir.1982).

■ Rule 10b–5, Florida's securities fraud statute and Florida common law fraud all require that the plaintiff prove (1) a *misrepresentation* or *omission* (2) of information *material* to the sales transac-

---

**4.** In *Bell,* the Supreme Court reversed a district court order dismissing the case for lack of federal jurisdiction, and held that the district court had subject matter jurisdiction where the complaint sought recovery of damages for violations of a plaintiff's Fourth and Fifth Amendment rights, even though it was not clear that federal courts had authority to grant such relief. According to the Court, where an action "seek[s] recovery directly under the Constitution or laws of the United States, the federal court ... must entertain the suit" unless "the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." *Bell,* 327 U.S. at 681–683, 66 S.Ct. at 775–776. Explained the Court,

> Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

*Id.* at 682, 66 S.Ct. at 776. *See also Meason v. Bank of Miami,* 652 F.2d 542 (5th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1428, 71 L.Ed.2d 649 (1982) (plaintiffs' claims that certificates of deposit were "securities" within the meaning of the federal securities laws were not so immaterial or insubstantial as to allow dismissal of their complaints for lack of subject matter jurisdiction). Although we doubt that section 10(b) applies to the instant transaction, appellees' claim that 10(b) does apply is not without prece-

dential support and is a sufficiently substantial and material claim upon which to base subject matter jurisdiction.

**5.** On the power of federal courts to entertain pendent claims, the Supreme Court stated in *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138 (emphasis in original),

> Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority ...,' U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103 [53 S.Ct. 549, 77 L.Ed. 1062]. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

Whether a federal claim is sufficiently substantial to be the basis for federal question jurisdiction "is to be determined on the face of the pleadings and the ultimate disposition of the federal claim is immaterial on the question of power ...." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* 114–15 (1984).

**6.** The only difference is that the scienter requirement is a bit stricter under section 10(b) and rule 10b–5 than under Florida statutory and common law fraud. *See infra* p. 3194. This difference in no way disturbs our rationale for not ruling on the applicability of the federal and the Florida securities fraud statutes to this case.

tion (3) upon which the purchaser reasonably *relied* (4) that *proximately caused* his injury. *Huddleston v. Herman and MacLean,* 640 F.2d 534, 543 (5th Cir.1981), *rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Alexander/Davis Properties, Inc. v. Graham,* 397 So.2d 699, 706 (Fla.Dist.Ct.App. 1981); *Merrill Lynch, Pierce, Fenner & Smith v. Byrne,* 320 So.2d 436 (Fla.Dist.Ct. App.1975). The only difference in the proof required by these laws is that 10b–5 requires that the defendant knew of or recklessly disregarded the falsity of his misrepresentation, while mere negligence satisfies Florida statutory and common law. *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 690–91 (11th Cir.1983); *Kutner v. Kalish,* 173 So.2d 763, 765 (Fla.Dist.Ct.App.1965).

■ The trial court filled eighteen pages with carefully made, detailed findings on each of the above requirements. Appellant challenges almost every one of these findings. Having checked each of the challenged findings against the thirty-one volume record, we find them all to be sufficiently, and in many cases overwhelmingly, supported by the evidence.

■ Appellant also argues that the trial court based its judgment on fraudulent conduct not alleged in the pleadings, thus committing reversible error. *See United Transportation Union v. State Bar of Michigan,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *Armstrong Cork Co. v. Lyons,* 366 F.2d 206 (8th Cir.1966). The trial court did find a number of omissions that had not been raised as issues ˙or grounds for relief by the pleadings.[7] However, the record indicates that evidence of these unpleaded omissions was admitted only to show Wagner's mental state in regard to the allegations of fraud that had been pleaded.[8] Nothing in the record suggests that the court counted the unpleaded omissions among those upon which it based its judgment of fraud or its damages award.

■ Finally, appellant argues that the district court erred in its assessment of damages, primarily because its assessment is not supported by the evidence.[9] In the securities fraud area, the out-of-pocket measure of damages applies. Under the out-of-pocket rule, a plaintiff is entitled to the difference between the purchase price paid for the security and the value the security would have had absent the misrepresentations and omissions. *Huddleston,* 640 F.2d at 555–56. The trial court found that this difference amounted to $62,-336.40. Upon careful review of the record, we are convinced that the evidence amply supports the damage assessment in all but one respect. The evidence indicated that the value of a controlling position in a corporation is worth more on a per share basis than a non-controlling interest,[10] and

---

7. Specifically, these findings were that Wagner had failed to mention that a significant number of new Winslow distributorship agreements had been signed during the year, that these new contracts had a significant effect in improving Winslow's earnings picture, and that recently many of these new contracts had been cancelled. Also, the court found that Wagner failed to inform appellees that he felt Winslow was in a deteriorating condition and he had been trying to sell that division of Watsco.

8. When the appellees sought to introduce evidence of the unpleaded omissions, the court specifically stated,

    It is the view of the Court ... that Rule 9(b)k insofar as the particularity to allege the actual allegations of fraud are not stated with sufficient particularity to rely on them as a basis, as a specific basis for this Court to grant the relief sought under 10(b)(5).

    However, it is the Court's view that such evidence would, in fact, be admissible if it was, in fact, established and shown ... to bear on the possible evidences of intent, knowledge or other condition of the mind of Mr. Wagner with regard to the other allegations of fraud that are in this record.

    Record at 347.

9. Other alleged errors were that the district court considered extraordinary items in ascertaining the earnings figure, and that it did not weigh the "earnings trend" when picking the earnings figure. These claims are frivolous.

10. Mr. Gould, appellees' expert, testified that, in his experience as an investment banker, "the value of a controlling position in a corporation [is] worth more than the stock that is then trading on the market." Record at 1870, 1871.

that appellees purchased a controlling interest. However, the trial court failed to attribute a "controlling interest premium" to the value of the shares. Thus, we reverse the damages award insofar as the judge did not add a "control premium" to the value of the stock, and remand for the judge to give consideration to such a premium. If further hearings or a new trial on damages are necessary to make this determination, he may conduct them.

## CONCLUSION

For the foregoing reasons, the district court order is AFFIRMED in all respects, except its damages award, which we REVERSE and REMAND for proceedings consistent with this opinion.

---

Although Mr. Gould said that, in making his estimate of the stock value, he did not take into consideration that the stock was controlling, he did not say that it would have been inappropriate to do so. Rather, he said, without explanation, that he had considered only the fiscal year statement in making his assessment of the stock's value. Record at 1868, 1872.