**Jerry ZELMAN, Plaintiff,**

v.

**James R. COOK, R. Lawrence Dunworth and Rorer Group, Inc., Defendants.**

**No. 83–2537–CIV.**

United States District Court, S.D. Florida.

July 17, 1985.

Richard Williams, Miami, Fla., for plaintiff.

Barry R. Davidson and Lewis F. Murphy, Miami, Fla., Raymond Cullen, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEHOE, District Judge.

Plaintiff Jerry Zelman ("Zelman"), a former shareholder of Cilco, Inc. ("Cilco") brought claims based on alleged violations of the Florida and federal securities laws, state common law, and the Florida Anti-Fencing Act against Defendants James R. Cook ("Cook") and R. Lawrence Dunworth ("Dunworth") who were also former shareholders, officers and directors of Cilco, and against Defendant Rorer Group, Inc. ("Rorer"), the present corporate parent of Cilco's merger partner.

The Plaintiff claimed that the individual defendants usurped the value of Cilco in two steps. First, Cook and Dunworth allegedly diverted without consideration, certain corporate assets from Cilco, *i.e.*, regional exclusive distribution rights, to Tri-State Optical Company, Inc., ("Tri-State"), a corporation owned 50% each by Cook and Dunworth. Then, almost a year later Cook and Dunworth allegedly negotiated a triangular merger of Cilco, Tri-state and a subsidiary of Rorer for a total price of $35,000,000.00 for both entities, thereby receiving excessive value in exchange for their Tri-State shares, *i.e.* $12,000,000.00, which value allegedly should have been added to the $23,000,000.00 of Rorer stock exchanged for Cilco shares. Plaintiff claimed that Cook and Dunworth implemented the merger by seeking unanimous shareholder approval of the plan through fraud, economic duress and undue influence, and that Rorer aided and abetted in this alleged scheme to defraud Cilco's minority share-

holders. The merger plan received full approval of all shareholders, including Zelman, and was subsequently consummated.

On April 18, 19, and 22, 1985, a non-jury trial was conducted. On April 26, this Court heard closing argument and subsequently found for the Defendants on all claims. The following paragraphs set forth the findings of fact and conclusions of law to support the judgment of this Court. Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. Cilco is a Delaware corporation engaged in the distribution and sale of certain intraocular lens devices (hereinafter "IOLs") and is the successor to Intra-Lens and California Intra Lens Co. ("California Intraocular" or, collectively, "the Company"). Zelman and Tri-State, along with others, first bought stock in the Company in 1975. Tri-State subsequently sold its shares to Cook and Dunworth in 1977. At the time of the merger, Cook and Dunworth owned approximately 30.5% of the Company each, and Zelman owned 16%.

2. On January 31, 1976, both Southeast Intraocular Lens Distributors, Inc. (hereinafter "Southeast"), a corporation owned by Zelman, and Tri-State, owned by Cook and Dunworth, entered into five year regional distributorship agreements with the Company. These distributors purchased accounts receivables in their regions and provided an influx of capital into the Company by shifting certain burdens of cash flow from the Company. The distributorships developed the vigorous marketing and sales programs necessary to establish the Company in a very competitive marketplace. Distribution in the western region was performed by Cilco Western Sales ("Cilco Western") and later by Cilco Sales Corporation ("Cilco Sales") after it was formed as a solely owned subsidiary of Cilco. The Board of Directors and Officers of Cilco and Cilco Sales were the same and held contemporaneous meetings. The formation of Cilco Sales also provided certain preservation of capital advantages through tax deferral.

3. In May 1977, Southeast was $99,-000.00 in arrears under its distribution agreement. Zelman proposed a payment plan to Cilco's Board of Directors to eliminate this debt, which the Cilco Board approved. Zelman and Cook both served as directors at this time. The Board also agreed with Zelman that once payment was made, Southeast would be reinstated as a distributor but that Tri-State would actually perform Southeast's distribution functions, i.e., invoicing shipping, inventory, telephone order taking, etc., from that point on with Zelman receiving three-fourths of Southeast's 40% commission in the retail sale price of the IOL's during the period of the five year agreement.

4. In July, 1978, Cilco Western was terminated for cause, and Cilco Sales took over the region. The Board of Directors, including Zelman, Dunworth and Cook then president of the Company, voted unanimously for the termination.

5. Cilco was a rapidly growing high tech company under the strict regulatory control of the Bureau of Medical Devices (BMD) of the Food and Drug Administration (FDA). Under the authority of statutory provisions for investigational device exemptions, FDA regulations required extensive clinical testing of IOLs by qualified opthalmologists and the tracking of every lens manufactured and implanted. The distributors undertook the financial burden of hiring and training a sales force capable of ensuring compliance with FDA regulations. In this regard, Tri-State also purchased and leased to Cilco a computer programmed to meet compliance with FDA regulations.

6. Industry growth during this time period was rapid as new IOL styles were developed and marketed. Because Cilco was a new company in a fledgling highly regulated industry, Cook and Dunworth were required to personally guarantee all Cilco loans and lines of credit. These guarantees totalled in excess of $1 million on loans and credit lines obtained by Cilco to finance its expansion.

7. Convertible debentures were also sold to raise capital. While the debentures

were offered to all shareholders on a pro rata basis, only four shareholders, including Cook, Dunworth and Zelman, purchased the convertible debentures when offered.

8. On September 15, 1979, Zelman was not reelected to the Cilco Board of Directors. At that time, Dunworth became Executive Vice President of Cilco. Cook and Dunworth retained their positions as officers and directors through the effective date of the merger.

9. On November 26, 1980, Cook notified Zelman by certified mail that Southeast's distribution agreement with Cilco would not be renewed after the expiration of its five year term in January, 1981, and it was not in fact renewed.

10. As of December, 1980, Tri-State's distribution contract was renewed. Under the renewed agreement, Tri-State continued its distribution functions in its original territory and additionally assumed such functions for a six state area formerly in the western region and for Southeast's territory. Tri-State paid $300,000.00 for the accounts receivable of the incremental six state area, thereby infusing needed capital into Cilco.

11. As of December, 1980, Tri-State had accounts receivables in the neighborhood of $1,000,000.00 which Cilco would have been obligated to purchase either in lump sum or overtime had it not been renewed. Tri-State and its sub-distributors had a strong sales force then in place and the capacity for rapid training and deployment of a large sales force into the newly acquired territory at a time when the Company was emphasizing market penetration and sales development. As of the time of the merger, Tri-State and its sub-distributors had hired, trained and placed in the field a substantial sales force.

12. Although Cook and Dunworth made all significant policy decisions and controlled the Cilco Board of Directors at this time and at all times thereafter, the renewal of Tri-State was in the best interest of Cilco and Cilco's shareholders. Tri-State was not renewed solely for the financial benefit of Cook and Dunworth.

13. Cook and Dunworth fully disclosed the potential conflicts of interests between themselves and entities they controlled which provided services, equipment or facilities to the Company and its operations to the Board of Directors and to the Company's shareholders.

14. In January or February, 1981, Zelman, individually and on behalf of Southeast, agreed to accept $153,914.70 in settlement of the accounts receivables due Southeast. On March 10, 1981, after consulting with his accountants, Zelman signed a general release as to "any and all causes of action" he or Southeast had at that time against "Cilco" and "Tri-State," and "their *officers, directors, employees and agents*, as representatives *and personally* ..." Zelman has received the full $153,914.70 in settlement and has not tendered its return. Zelman's decision to sign the release was completely voluntary and was made without coercion or duress or undue influence.

15. From 1976 through December, 1981, various entities expressed an interest in acquiring or merging with the Company and its distributors. In about June, 1980, Defendant Rorer began to express such an interest through its Vice President for Corporate Development, Arthur Rauch. However, discussions were terminated in early December, 1980. In April, 1981, representatives of Rorer, in particular Rauch, suggested the reopening of discussions which began in earnest in August, 1981.

16. Cook, Dunworth and their attorneys met with Rauch and other members of Rorer's management and its attorneys in Fort Washington, Pennsylvania on September 14 and 15, 1981 to negotiate a merger of Cilco and Tri-State into a to-be-formed subsidiary of Rorer. On October 8, 1981, Rorer, Cilco, Tri-State, Cook and Dunworth reached an agreement in principle, reduced to writing, but not executed by Cook and Dunworth, on the merger of Cilco and Tri-State into RGI New Company, a to-be-formed subsidiary of Rorer.

17. The obligation of Cilco and Tri-State to proceed was subject to unanimous ap-

proval of Cilco and Tri-State shareholders, while Rorer's obligation was conditioned upon approval of at least 90% of Cilco and Tri-State's shareholders. Although Rorer did not require unaniminity, as did Cook and Dunworth, Rorer believed that unanimous approval would be even more favorable because such approval ensured a "clean" deal.

18. Rorer agreed to exchange $35 million in Rorer stock for all of the stock of Cilco and Tri-State. Cook and Dunworth proposed an allocation of approximately $12 million to Tri-State and $23 million to Cilco. Rorer did not object to the allocation.

19. The allocation of $12 million to Tri-State and $23 million to Cilco was fair and reasonable. The allocation of price was based upon a multiple of sales, after tax earnings and net asset value, and was reasonable and fair in comparison with similar acquisitions in the industry. Evidence on this point was basically unrebutted by any credible or competent evidence, expert or otherwise, presented by the Plaintiff. The Court finds that no portion of the $12,000,-000 in Rorer stock should have been allocated to Cilco for distribution to its shareholders, including the Plaintiff, and that the amount of $23,000,000.00 was a fair price for Cilco.

20. On October 12, 1981, Cook sent Cilco shareholders, including Zelman, a letter advising of and explaining the proposed merger. Attached to the letter were the October 8 agreement in principle, Cilco financial statements, and Rorer annual reports and interim statements. Also attached to the letter was a consent form which each shareholder was asked to sign and return to Cook to evidence their intent to vote their shares in favor of the merger and to waive any and all potential claim against the Company, its officers, directors or other shareholders.

21. Upon review of the letter of October 12, 1981, Zelman determined that in his opinion the transaction was unfair. He also concluded that it contained misstatements, and omitted material information. Zelman then obtained the advise of his present attorneys, Blackwell, Walker, Grey, Powers, Flock & Hoehl ("Blackwell, Walker") who advised him that, if he elected to not approve the merger, he could institute litigation and that he could win.

22. Zelman had also sought and obtained the advice of Kaufman, Rossin & Co., his accountants who had previously served as Cilco auditors, on the merger transaction as disclosed in the letter of October 12, 1981 and agreement in principle dated October 8, 1981. Zelman conferred with his accountants on at least six occasions. These accountants advised Zelman that the merger plan was unfair because of the allocation to Tri-State, but that the price of $23,000,000 for Cilco was an excellent price for that Company. The accountants further advised Zelman that, under the terms of the agreement in principle, he could block the merger by withholding his consent. Finally, they advised him not to sue but to consent to the merger transaction and to sell his interest in Cilco.

23. The record clearly shows that at the time of the merger, Defendant Cook and Plaintiff Zelman were in an adversarial posture. The Court finds credible the Plaintiff's testimony that, at some date between October 12, and October 20, 1981, Zelman contacted Defendant Cook by telephone to inquire into the $12,000,000.00 allocation to be made to Tri-State, and that Cook told Zelman, essentially, that if Zelman defeated the merger, "he would really find out what it meant to be treated as a minority shareholder."

24. On October 22, 1981, Zelman signed and returned the consent form. All but one of the Cilco shareholders did likewise. The lone shareholder, the former owner of Cilco Western, was then in litigation with the Company.

25. At the time that he signed and tendered the consent form, Zelman was aware that he not only had an alternative to signing the consent form, but that his decision to consent or not to consent controlled the entire merger transaction.

26. The Court finds that, based upon the totality of the evidence, the Plaintiff

acted voluntarily, and without being subjected to undue influence, duress or coercion when he signed the consent form and subsequently voted his proxy in favor of the merger transaction.

27. The letter of October 12, 1981 did not contain any material misrepresentations or omissions, nor did it reflect any intent on the part of Defendants Cook, Dunworth or Rorer Group, Inc. to mislead, deceive, manipulate or defraud any shareholder. However, even if the October 12, 1981, letter was misleading, contained material misrepresentations or omitted material information, the Court finds that Zelman clearly did *not* rely upon the letter in determining to sign the consent form, to vote by proxy for the transaction and to exchange his Cilco shares for Rorer shares upon consummation of the merger.

28. On November 9, 1981, Cook advised Zelman and all shareholders of their statutory appraisal rights and informed them that the agreement in principle had been signed even though one shareholder had not yet returned the consent form.

29. On November 20, 1981, the Board of Directors of both Cilco and Tri-state approved the merger.

30. On November 23, 1981, Zelman returned a proxy voting his shares in favor of the merger, and on November 25, 1981, he signed and submitted a Stockholders Certificate and Biographical Information Sheet, paragraph two of which stated that Rorer management had satisfactorily answered all questions that he or his advisors had, if any, about Rorer or the merger and related transactions.

31. On November 30, 1981, Cilco's shareholders unanimously approved the merger. The merger closed on December 1, 1981.

32. Cook and Dunworth did not engage in self-dealing with respect to the merger transaction.

33. As of December 1, 1981, the date of the merger transaction, all of Cilco's intraocular lens products were classified as being in an investigational status by the Food and Drug Administration.

34. Zelman's total investment in Cilco from 1975 through 1981 was $102,000.00. He received Rorer stock of a value in excess of $3.6 million in the merger transaction.

35. Any of the foregoing findings of fact which may constitute conclusions of law are hereby adopted as conclusions of law.

## CONCLUSIONS OF LAW

1. As to Plaintiff's claims under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) and Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, jurisdiction and venue are proper in this Court under 15 U.S.C. § 77v, 15 U.S.C. § 77aa, and 28 U.S.C. § 1331. As to Plaintiff's state law claims, this Court exercises its pendent jurisdiction under 28 U.S.C. § 1391.

2. Plaintiff's claims under Section 17(a), 10(b) and Rule 10b–5 are strictly questions of federal law as to which this Court must follow only decisions of the United States Supreme Court and the body of precedent established and adopted by the United States Court of Appeals for the Eleventh Circuit.

3. Plaintiff's state law securities claim under Section 517.301, Florida Statutes, is governed by Florida law, but federal securities law cases are highly persuasive in construing Florida's securities law. See *Hudak v. Economic Research Analysts, Inc.*, 499 F.2d 996, 999–1000 (5th Cir.1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975).

4. Plaintiff's claim under the Florida Anti-Fencing Act, Florida Statutes, Chapter 812 is governed by Florida law.

5. Plaintiff's state law breach of fiduciary duty claim is governed by the law of Delaware, the state of Cilco's incorporation.

6. Plaintiff's common law fraud claim is governed by the law of Florida, as are

Defendants' defenses of release and waiver.

■ 7. Plaintiff's claims under Section 17(a) must fail because no private right of action exists. *Landry v. All American Assur. Co.*, 688 F.2d 381 (5th Cir.1982); *Summer v. Land & Leisure, Inc.*, 571 F.Supp. 380 (S.D.Fl.1983).

8. In addition to requisites not relevant here, § 10(b), Rule 10b–5, Florida's securities fraud statute and Florida common law fraud all require that the plaintiff prove (1) misrepresentation or omission (2) of information material to the sales transaction (3) upon which the purchaser reasonably relied (4) that proximately caused his injury. *Alna Capital Associates v. Wagner*, 758 F.2d 562 (11th Cir.1985); *Alexander/Davis Properties, Inc. v. Graham*, 397 So.2d 699, 706 (Fla. 4th DCA 1981); *Merrill Lynch, Pierce, Fenner & Smith v. Byrne*, 320 So.2d 436, 440 (Fla. 3rd DCA 1975). The only difference in the proof required by these laws is that Rule 10b–5 requires that the defendant knew of or recklessly disregarded the falsity of his misrepresentation, while mere negligence satisfies Florida statutory and common law. *Alna Capital Associates v. Wagner, Supra, Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 710 F.2d 678, 690–91 (11th Cir.1983).

■ 9. The Plaintiff had standing to proceed in a direct action under 10(b) and Rule 10b–5 as a purchaser of securities, because he actually exchanged his shares in Cilco for shares in the new company pursuant to the merger transaction, and because he alleges that the fraudulent activity of the Defendants caused him to exchange his stock. *S.E.C. v. National Securities, Inc.*, 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

10. The Court finds as a matter of law that the Plaintiff has failed to prove that the Defendants made material misrepresentations or omissions.

■ (a) *Failure to Disclose Merger Options*. Plaintiff contends that "Cook and Dunworth ... did not disclose ... the possible merger options available to Cilco."

(Amended Complaint, ¶ 40) Plaintiff has admitted as true that no other competing merger offers existed and that he was generally aware of the interest of other companies in acquiring Cilco. Further, other entities' expressions of interest in Cilco which had not been reduced to a concrete offer and agreement in principle are not material. As long as no other agreement in principle had been reached, the existence of other suitors and the state of those negotiations, if any, was not disclosable as a matter of law. *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075 (5th Cir.1970); *Staffin v. Greenberg*, 672 F.2d 1196, 1205–07 (3rd Cir.1982). The only material information was the terms of the pending offer reduced to writing and presented to shareholders for their approval; therefore, this alleged omission fails the materiality test.

■ (b) *Nondisclosure of Broker*. Plaintiff next contends that the failure to disclose the identity of the broker and the circumstances under which he operated was fraudulent. However, the agreement in principle did disclose that a broker, David Cleary, would be paid a broker's fee by Rorer. The Plaintiff testified that the existence of a broker paid by Rorer would have made no difference to his investment decision at all. Thus, this allegation does not present a material omission.

■ (c) *Nondisclosure of Self Dealing*. The Plaintiff's third alleged omission is that Defendants "failed to disclose ... the true nature of their self dealing." (Amended Complaint ¶ 39). The Court finds that the proxy materials fully disclosed the price paid for Tri-State, and all material aspects of all other side agreements in which Defendants had an interest. In a situation such as this, where the "nature and scope of a transaction are clear," no characterization of those facts was required. *Alabama Farm Bureau Mut. Cas. Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602, 610 (5th Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980). Thus, Plaintiff has failed to allege a material omission.

■ (d) *Allocation of the Purchase Price.* The Plaintiff has also alleged that the October 12 letter from Cook to Cilco minority shareholders was misleading because it failed to disclose whether Rorer or Cook and Dunworth proposed the allocation of $12 million to Tri-State and $23 million to Cilco. This is not a material omission.

The allocation was not presented as embodying the adequately investigated and considered recommendation of the Board of Directors as to the intrinsic value of the respective corporations. *Smith v. Van Gorkum*, Case No. 255, 1982 (Del. Jan. 29, 1985). Rather, the letter of October 12, 1981 presented it as a deal having "considerable merit" with the "very good opportunity [for shareholders] to diversify their risks." Cook stated his belief that the Board was prepared to approve the transaction as being in the best interest of the corporation and all shareholders. However, in order to be sure of the fairness of the deal to all, each shareholder was given an absolute veto right by Cook and Dunworth. Further, Rorer's requirement that not more than 10% of the shareholders of Cilco seek appraisal rights effectively provided, at the very least, that a supermajority vote of the minority shareholders was necessary to consummate the transaction.

The Plaintiff testified at trial that he felt the allocation was unfair before he signed the consent form and before he executed his proxy voting his shares in favor of the merger. The Plaintiff knew that he had an absolute veto right on the transaction under either the 100% of the 90% approval requirements. The Plaintiff has not explained how his knowing who made the allocation could have materially affected his decision to agree to the merger.

■ (e) *Cook and Dunworth Did Not Actively Solicit the Sale of Cilco.* Zelman contends that the second sentence in the first paragraph of the first page of the letter of October 12, 1981 contained a misrepresentation, in particular, he points to the phrase "[a]lthough we have never actively solicited a sale of Cilco ..." The evidence submitted showed considerable interest in Cilco and its distribution network by other companies interested in an acquisition. It also showed that Plaintiff was well aware of this interest, and that Cook and Dunworth responded to such requests and polite inquiries through correspondence, personal meetings, and familiarization tours.

Moreover, the evidence disclosed that in the particular instance of Rorer, Cilco and Cook and Dunworth were always "the pursued" and not the pursuers. Indeed, the deal itself is evidence of the extent Cook and Dunworth bargained on behalf of Cilco and Tri-State from a position of strength. Therefore, this phrase was not misleading and, assuming it were, such information would not have altered the "total mix" of information available to the Plaintiff. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

■ (f) *Cilco's Possible Inability to Continue Internal Financing.* The second misrepresentation Zelman points to is the first sentence of the second paragraph on page two of Cook's October 12, 1981 letter, which states as follows:

> Although we feel that the company can continue to grow without merging with a larger company, there are compelling reasons for such an action at this time. Among these is the possibility that we will be unable to continue financing internally the growth of CILCO which might lead to the necessity of outside equity financing or additional stock offerings.

Considerable competent testimony admitted at trial, however, indicates that the Defendant's statement was true. Defendant Cook testified that following the merger, Rorer paid $33 million into Cilco in order to fund the next stage of its development in the rapidly expanding IOL field and to finance its diversification of product line. It is undisputed that only four of Cilco's shareholders—three of whom were the Plaintiff and the individual Defendants herein—opted to participate in the Company's last effort to raise capital internally, the convertible debenture offering.

Further, while the purpose of the regional distributors was to raise capital, Southeast was $99,000.00 in arrears within 15 months of its inception and Cilco Western had to be terminated for cause. In light of these circumstances, and the fact that Cook and Dunworth had been required to personally guarantee Cilco's loans and lines of credit for several years, Cook had good reason to believe that Cilco might not be able to continue internal financing in the future.

Even if the statement complained of is not capable of being scientifically verified as "the truth," it is not misleading because it is an accurate statement of the opinion of management. *Alaska Interstate Co. v. McMillian*, 402 F.Supp. 532, 546 (S.D.N.Y. 1975). "Cash flow projection ... is far from an exact science." Thus, management "should not be precluded from making a good faith statement of its opinion on this subject merely because reasonable men could differ on the validity of management's cash flow projections and the underlying assumptions." *Alaska Interstate Co. v. MacMillian*, 402 F.Supp. at 546. Further, where, as here, complete copies of the Company's financials have been provided to all shareholders and no request for additional information is made, management is not required to provide any additional information to allow the stockholder to assess the validity of those good faith cash flow projections. *Id.* Thus, even though the Plaintiff may disagree with Cook's statement of opinion that the *possibility* of cash shortgages *might* lead to outside equity financing or additional stock offerings, and even though his disagreement may be reasonable, Cook's statement was not a material misrepresentation.

■ (g) *FDA Investigational Status.* A third misrepresentation Zelman points to its Cook's statement in his October 12 letter that "We must bear in mind that we are *essentially* a one-product company and that this product is still classified as investigational by the FDA." (emphasis added). Again, this statement was true and, therefore, was not a material misrepresentation. Cilco was essentially a one product company in that the sales of its recent acquisition of David Knofp Instruments (DKI), whose product was opthalmic instruments, amounted to less than 10% of Cilco's total sales.

As to the status of government approvals of IOLs, Cook's statement was also true. The evidence shows that at the time of the merger transaction, no Cilco pre-market application for any of its IOLs had received final FDA approval; thus, all were in an investigative status.

■ (h) *Requisite Shareholder Approval.* Finally, the Plaintiff claims that the characterization of the necessary shareholder approval in Dr. Cook's October 12, 1981 letter was misleading. The allegedly misleading statements are as follows:

It is my understanding that, in paying what they feel is a premium price for the Company, Rorer would like to avoid any questions or controversies after the acquisition which might result in the Company not operating smoothly or profitably. More importantly, the majority shareholders of CILCO and Tri-State will not hesitate to withdraw their support of this merger if all parties are not in full agreement regarding these transactions.

The Plaintiff claims that the statement was misleading because it implies that *Rorer*, rather than Cook and Dunworth, imposed the 100% approval requirement. Even assuming that Cook's letter is susceptible to such an interpretation, and assuming that Zelman's interpretation amounts to a misrepresentation, the misrepresentation was not material. It is immaterial whether Rorer or Cook and Dunworth insisted upon 100% approval of the merger. In either instance, each shareholder would have veto power over the transaction. *TSC Industries v. Northways, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

Further, as to the Plaintiff specifically, it was surely immaterial. Rorer did, in fact, insist upon 90% approval by Cilco's shareholders as was clearly set out in the agreement in principle attached to and referenced by the letter of October 12th. Because the Plaintiff owned 16% of Cilco's stock, he possessed absolute veto power

whether Rorer insisted upon 90% or 100% approval and he was aware of that fact. Because the Plaintiff has failed to show that the Defendants made any material misrepresentations or omissions, his Rule 10B–5 claim must fail.

11. Even assuming that Zelman has shown *material* misrepresentations and omissions, his Rule 10b–5 still must fail. This is so because the evidence noted in detail in this Court's Findings of Fact demonstrates that he did not actually rely on the alleged misrepresentations.

12. Zelman's state law securities claim fails for the reasons stated in the Court's conclusions as to Rule 10b–5, *supra*. See *Alna Capital Assoc. v. Wagner*, 758 F.2d 562 (11th Cir.1985) *Hudak v. Economic Research Analysts, Inc.*, 499 F.2d at 999–1000.

13. Based on this Court's findings of fact, Zelman has failed to establish material misrepresentation and actual reliance, elements necessary to establish common law fraud. See *Alna Capital Assoc. v. Wagner, supra*. As a matter of law, the Plaintiff has failed to prove common law fraud.

14. The gist of Plaintiff's breach of fiduciary duty claim is that at the time the triangular merger between Cilco, Rorer and Tri-State was consummated, Tri-State should not have existed. Instead, Plaintiff argues that Cilco should have been performing all distribution responsibilities itself, thereby obtaining the benefit of the 40% margin on sales, which went to Tri-State, and ultimately receiving the value of Tri-State paid to its shareholders upon merger into Rorer. By such argument, it is clear that Plaintiff is stating that Tri-State's retention of its distribution rights through the renewal of its distribution agreement with Cilco in December, 1980 constituted, if true, a usurpation of a corporate opportunity and a waste of corporate assets.

15. The Defendants Cook and Dunworth from June, 1980 through the acquisition of Cilco by Rorer Group, Inc. on December 1, 1981, were majority shareholders in Cilco and as such owed a fiduciary duty to the minority shareholders in the corporation. It is settled law in the State of Delaware that a person holding a majority interest in a corporation or a combination of shareholders whose joint holdings amount to a majority and who act in concert must adhere to the fiduciary standards imposed by the law of that state. *Weinberger v. UOP*, 409 A.2d 1262, 1265 (Del. Ch.1979). The parties stipulated that Delaware law applies to the relationships between the former shareholders of Cilco for the purpose of this action. Moreover, Cilco was incorporated in Delaware, and the law of the state of incorporation traditionally applies to determine the relationship among the officers, directors and shareholders. *E.g., Schein v. Chasen*, 313 So.2d 739, 741 (Fla.1975); *Grimes v. Donaldson, Lufkin & Jenrett, Inc.*, 392 F.Supp. 1393, 1403 (N.D.Fla.1974).

16. Delaware has long recognized a fiduciary duty on the part of majority shareholders, officers, and directors to the minority shareholders of the corporation. It is clear that minority shareholder actions involving allegations of breaches of fiduciary duty can be brought directly. Delaware Courts have considered numerous post-merger actions brought by minority shareholders against majority shareholders for breaches of fiduciary duty, where the minority shareholders have sued on their own behalf, and not derivatively for the benefit of the corporation. *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983); *Harmon v. Masoneilan, Intl., Inc.*, 442 A.2d 487 (Del.1982); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497 (Del.Supr.1981).

17. The Plaintiff has failed to prove that the Defendants breached the fiduciary duty owed to him. The evidence shows that both the decision to renew Tri-State's distribution contract, and the allocation of the merger purchase price was intrinsically fair to Cilco and its shareholders.

a. *Renewal of Tri-State.* Tri-State was the most successful of the regional distributors. Sales of Cilco products in the areas covered by Tri-State were consistently the highest. Testimony by Defendants' expert

witness reveals that this success was attributable to the "bond" that Tri-States salespersons had developed with their customers. Cilco came to be perceived as a reliable manufacturer of quality IOLS. A "bond" of this variety is crucial to the success of a developing company such as Cilco was at the time Tri-State was renewed. As further testified to by Defendants' expert witness, interviews with physicians revealed that this same bond did not exist in Florida (which was part of Southeast's territory) or California (which had been serviced by California Western and Cilco sales). Thus, where the other distributorships had failed, Tri-State had proven successful in an area critical to Cilco's growth and survival.

Further, the principal function of the various distributors over the years was to provide an influx of needed capital into Cilco. Tri-State had fulfilled this purpose while other distributors, such as Southeast, had not. Tri-State was an established and successful distributor, and it was not in Cilco's economic best interest to undertake the capital outlay necessary to field an effective sales force, nor to purchase Tri-State accounts receivables of nearly $1,000,000.00, especially since Cilco was justifiably concerned about its ability to continue internal financing. In view of all aspects of the transaction, it is apparent that the renewal of Tri-State was honest, fair and reasonable—*i.e.,* "intrinsically fair" to Cilco. *Weinberger v. U.O.P., Inc.,* 457 A.2d 701 (Del.1983); *Tranzer v. International Gen. Indus.,* 402 A.2d 382, 386 (Del.Ch.1979).

b. *Allocation of the Purchase Price.* The evidence reveals that prior to the merger, Cook requested an independent accounting firm to prepare a combined financial statement for Cilco and Tri-State. This financial statement supports the allocation chosen by Defendants. Further, Arthur Rauch, currently a vice president of a New York investment banking firm and formerly Rorer's Vice President for Corporate Development, testified at length that the split was more than fair to Cilco, and that had he been making the split, Cilco shareholders would not have fared so well. In

short, Rauch felt that Cook and Dunworth "leaned over backwards" to be fair to minority stockholders, and that they had in effect "cheated themselves." Finally, the Defendants' expert witness testified that, if he had been retained to evaluate the merger plan in 1981, he would have approved the split as "reasonable." No credible testimony to the contrary was offered. Thus, the allocation of $12 million to Tri-State and $23 million to Cilco was intrinsically fair. *Weinberger v. U.O.P., Inc.,* 457 A.2d 701 (Del.1983).

■■■■ 18. The evidence introduced at trial further demonstrates that the Plaintiff released any claims against the Defendants, Cook and Dunworth, concerning the distributorships. On March 10, 1981, the Plaintiff agreed to accept $153,914.70 in settlement of the accounts receivable due Southeast, and signed a release as to all claims involving Tri-State, Cilco and Southeast, as of that date, which included the officers, directors, employees and agents, as representatives and personally.

The evidence shows that the Plaintiff discussed the non-renewal of Southeast, which had essentially been run by Tri-State since 1977, with Cook and Cilco's comptroller, J. Richard Damron. Further, he discussed the accuracy of the accounts receivables data supplied him with his accountants, all prior to signing the release. The Plaintiff also admitted that before signing the release, which terms are clearly all-inclusive, he did not make any inquiry as to any of the affairs of Tri-State, including the question of whether Tri-State's distribution contract had been renewed. Nor has he tendered the return of the consideration he received pursuant to the release. Under these circumstances, the Plaintiff's asserted unilateral mistake as to the legal effect and scope of the release resulted from the want of due care and diligence, and cannot overcome the clear and unambiguous terms of the release. All claims against Cook and Dunworth arising prior to March 10, 1981, are barred. *Dean v. Bennett M. Lifter, Inc.,* 336 So.2d 393 (Fla. 3rd DCA 1976). *Weingart v. Allen &*

*O'Hara, Inc.,* 654 F.2d 1096, 1103–04 (5th Cir.1981).

On October 22, 1981, the Plaintiffs signed a second waiver and release document, the consent form, the terms of which were consummated by his vote through proxy in favor of the transaction on November 30, 1981. This consent form waived and released all defendants from all liability relating to the company and the merger.

The Plaintiff claims that his signing of this release was involuntary. First, he claims economic duress. However, Plaintiff has failed to establish economic duress because he has not shown "that circumstances permitted no other alternative [but to sign the release]. *Friedman v. Bache & Co.,* 321 F.Supp. 347, 350 (S.D.Fla.1970) *aff'd with opinion,* 439 F.2d 349, 350 (5th Cir.1971); *City of Miami v. Kory,* 394 So.2d 494, 499 (Fla. 3rd DCA 1981). Instead, the Plaintiff has admitted that he was not in any financial difficulties and that he did not need the money. He has also admitted that he had present counsel at his disposal who advised him that a lawsuit "could be successful." He simply chose not to sue because of the time and expense involved in litigation. Thus, the Plaintiff knew that he did have an alternative which would have provided him with an adequate remedy. Simply put, he "had a choice ... [he] could stand pat and fight." *City of Miami v. Kory,* 394 So.2d at 499. The Plaintiff, however, chose to take the money instead of making a fight.

The Plaintiff claims that he signed the release as a result of fraudulent inducement. This claim must fail, first of all, because none of the claimed fraudulent misrepresentations and omissions concerning the merger occurred, nor if they had, would they be material. Secondly, Zelman has not shown *justifiable* reliance on these representations. In *Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir.1984), the Eleventh Circuit noted several factors which vitiate any right to rely on representations in a situation involving a release agreement, including (1) the fact that both parties are aware that they are in an adversarial relationship, and (2) that the party

signing the release is represented by counsel, and (3) that the releasor knew from prior dealings that he should not rely on Defendants' statements, and (4) that the releasor did not demand inquiry into relevant materials before signing the release and did not insist that any terms to protect him be inserted in writing into the release. Each of these factors is present in the instant case.

The Plaintiff had been in an adversarial relationship with the Defendants Cook and Dunworth since at least early 1981. This hostile relationship led to his demand, through counsel, to inspect corporate records. (See Exhibit 87.) From these and other alleged past dealings, Zelman knew or should have known not to rely on Defendants' alleged statements. In fact, the Plaintiff's trust in his relationship with the Defendants had so eroded by July, 1981 that, after conferring with his counsel, he decided to tape record portions of the annual shareholders meeting.

Zelman responds to these facts by claiming that as a result of this hostility he was denied an opportunity to inquire. However, the best that can be said about this claim is that it has been merged into the terms of the waiver and release. See Exhibit 16. Because the consent form waiver and the Stockholders Certificate and Biographical Information Sheet address Zelman's opportunity to inquire, all contentions pertaining to alleged fraudulent representations that denied him such an opportunity to inquire are merged into the waiver and release. *Pettinelli v. Danzig,* 722 F.2d at 710. Irrespective of the effect of the merger doctrine, the evidence shows that the Plaintiff was not denied an opportunity to inquire; he simply failed to exercise his right to inquire. The letter of October 12, 1981 expressly sought inquiries and instructed Plaintiff to seek advice on his merger vote. Plaintiff had previously retained his present counsel, Blackwell, Walker, and had demanded and obtained an inspection of various books and records of Cilco. However, he failed to require his attorneys to perform a similar inspection regarding the merger transaction.

The Plaintiff testified that he made only one call to Defendant Cook (or that Cook called him) and that he made no call or inquiry of any other officer or agent of Cilco, Tri-State or Rorer. Instead, he sought only the advice of Cilco's former accountants and his attorneys before he signed the consent and then, a month later, voted by proxy for the merger transaction. The Plaintiff simply has not met his burden of due diligence. *Ramel v. Chasebrook Constr. Co.,* 135 So.2d 876 (Fla. 2d DCA 1961). See *Gonzalez v. Patane,* 234 So.2d 8 (Fla. 3d DCA 1970); *Folz v. Beard,* 332 So.2d 129, 130 (Fla. 2d DCA 1976). See also *G.A. Thompson & Co. v. Patridge,* 636 F.2d 945, 954 (5th Cir.1981); *Branham v. Material Sys. Corp.,* 354 F.Supp. 1048, 1056 (S.D.Fla.1973); *Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *White v. Sanders,* 689 F.2d 1366, 1369 (11th Cir.1982).

While it is clear that if Zelman did rely, his reliance was not reasonable, it is equally clear that Plaintiff did not in fact, rely on *any* alleged misrepresentations by the Defendants. He testified, consistent with the testimony of his accountants, that he recognized almost immediately in the letter of October 12 what he thought were misstatements and misrepresentations to shareholders, and that he also had concluded that Defendants were "acting improperly" before he signed the consent form and voted his proxy. Nonetheless, instead of protesting or inquiring, and after receiving the advice of his accountant that the merger allocation was unfair and after conferring with counsel who advised him that they could win a suit, Zelman went ahead and consented to the transaction by signing the consent form waiver and sending in the proxy.

The Court, therefore, concludes that Plaintiff has failed to establish any right to rely, or actual reliance, on the alleged misrepresentations and that the release was not induced through fraud. *Pettinelli v. Danzig,* 722 F.2d 706, 710 (11th Cir.1984).

19. The Plaintiff has entirely failed to prove his claim that he was deprived of his rights to additional shares of stock by the Defendants Cook's and Dunworth's theft by misappropriation, fraud and deception (as defined in Fla.Stat. § 812.012), in violation of Fla.Stat. for the reasons discussed above.

20. The Plaintiff's claims of common law fraud, and violation of the federal and Florida securities law, brought against Rorer Group, as an "aider and abettor of the Defendants Cook and Dunworth," have not been proved for the reasons discussed at length above.

21. Any of the foregoing conclusions of law which constitute findings of fact are hereby adopted by the Court as findings of fact.