**COMMODITY FUTURES TRADING COMMISSION, State of New Jersey, and State of Florida, Plaintiffs,**

v.

**AMERICAN METALS EXCHANGE CORP., Anglo Swiss Metals, Ltd., F.C. & M. Investment Corp., Trans World Metals Corporation, Amalgamated Redemption Centers, Inc., Robert Maxwell a/k/a Robert Lebovitch, Bill Frank, and Michael Jebrock, Defendants.**

Civ. A. No. 87–2591.

United States District Court, D. New Jersey.

Aug. 31, 1991.

---

## OPINION

HAROLD A. ACKERMAN, District Judge.

In this action, the Commodity Futures Trading Commission and the States of Florida and New Jersey seek the issuance of injunctive and ancillary equitable relief against various persons and corporations allegedly engaged in conduct which violates the Commodity Exchange Act (the "CEA"), as amended, 7 U.S.C. § 1 *et seq.* (1988), the New Jersey Uniform Security Law, N.J.S.A. 49:3–50, *et seq.* (1989), and the Florida Investor Protection Act, Fla. Stat.Ann. § 517.101 *et seq.* (Westlaw 1991).

Presently before the Court are the plaintiffs' motions for summary judgment as to Counts II through VIII of the First Amended Complaint and the defendant Robert Maxwell's motions for additional living expenses and for an order to pay attorneys' fees.[1] For the reasons set forth below, I will grant the plaintiffs' motion for summary judgment on Counts II through VIII of the First Amended Complaint against each of the defendants. The defendant

---

1. The procedural history of this case is fairly complex. By Consent Order in July 1987, the defendants AME, Anglo–Swiss, FC & M, and Bill Frank were preliminarily enjoined from offering or selling the Equity Building Program to the public. In addition to enjoining the defendants, I appointed a temporary equity receiver for the defendants.

Subsequently, in a published Opinion appearing at 693 F.Supp. 168 (D.N.J.1988) I granted the plaintiffs' application to amend the Com-

plaint to assert claims for violations of state and federal law against the newly named defendants Robert Maxwell, Amalgamated, Michael Jebrock and TWM. In this same Opinion I found that the plaintiffs had demonstrated a likelihood of success in showing that the defendants had violated and would continue to violate the CEA and accordingly granted the plaintiffs' application for preliminary injunctive relief including the appointment of a receiver and an account-

Robert Maxwell's motions for additional living expenses and attorneys' fees will be denied. The factual background is this matter is discussed in my published Opinion *Commodity Futures Trading Commission v. American Metal Exchange Corp.* appearing at 693 F.Supp. 168 (D.N.J.1988), and I need not repeat it here.

*Standard of Review*

■ In considering this summary judgment motion, I shall keep in mind the Rule 56 standard of review. Rule 56 of the Federal Rules provides that "judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.Pro.* 56(c). The moving party has the initial burden of demonstrating this summary judgment standard, *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), which can be accomplished by simply pointing out to the Court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *see also Peters Tp. School Dist. v. Hartford Acc. & Indem. Co.,* 833 F.2d 32, 34 (3rd Cir.1987).

■ In opposing summary judgment, the nonmoving party must come forward with evidence supporting a claim that there is a genuine issue of material fact in dispute which requires resolution by the trier of fact. *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). The judge's role is "not to weigh the evidence and determine the truth of the matter," but to determine whether the evidence may reasonably be resolved in favor of either party. *Metzger v. Osbeck,* 841 F.2d 518, 519 (3rd Cir.1988). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3rd Cir.1989) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). All inferences to be drawn from the facts should be resolved in favor of the nonmoving party. *Peters Tp. School Dist.,* 833 F.2d at 34.

With these standards in mind, I turn to a discussion of the legal and factual issues involved in these motions.

*I. Motion for Summary Judgment Against All Defendants on Count II of the First Amended Complaint*

The plaintiffs have moved for summary judgment on Count II of the First Amended Complaint for Injunctive and Ancillary Equitable Relief under Section 4b(A) of the Commodity Exchange Act, 7 U.S.C. § 6b(A) (1988). The plaintiffs request such relief against the defendants, American Metals Exchange Corporation, ("AME"), Anglo–Swiss Metals Ltd., ("Anglo–Swiss"), F.C. & M. Investment Corp., ("FC & M"), Trans World Metals Corp., ("TWM"), Amalgamated Redemption Centers, Inc., ("Amalgamated"), Robert Maxwell, Bill Frank, and Michael Jebrock. Robert Maxwell is the only defendant who has opposed this motion.

*Liability*

■ Section 4b(A) of the CEA provides that

> [i]t shall be unlawful ... (2) for any person in or in connection with any order to make ... any contract of sale of any commodity for future delivery ... [which] may be used for (a) hedging any transaction in interstate commerce in such commodity or, ... (c) delivering any

---

ing freeze of the assets of the individual and corporate defendants.

In March 1990, I granted summary judgment against each of the defendants under Section 4a of the CEA, Count I of the First Amended Complaint. At that time I denied the plaintiffs' ap-

plication for permanent injunctive relief and granted the plaintiffs application for ancillary relief, ordering the defendants jointly and severally liable to disgorge the profits they received either directly or indirectly from their trading in illegal futures contracts, plus interest.

such commodity sold, shipped, or received in interstate commerce....

 (A) to cheat or defraud or attempt to cheat or defraud such other person.

7 U.S.C. § 6b(A) (1988). This section declares it unlawful for any person to deceive or defraud any other person in connection with the making of a contract for the sale of any commodity for future delivery. *Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 109 (2nd Cir.1986). In my published Opinion in this case, 693 F.Supp. 168, 194 (D.N.J.1988), I stated that a violation of section 4b(A) is established where, in connection with an order to make a contract of sale of a commodity for future delivery, the plaintiff has demonstrated: (1) a material misrepresentation of presently existing or past fact, (2) knowledge of the falsity by the person making the misrepresentation, (3) intent that the misrepresentation be relied upon, and (4) reliance on the misrepresentation. *B.F. Hirsch v. Enright Refining Co., Inc.,* 751 F.2d 628, 631 (3rd Cir. 1984).

As an initial matter, the plaintiffs contend that because actual damages need not be proven in an enforcement proceeding under Section 4b(A) of the CEA reliance is irrelevant. The plaintiffs point to decisions by the Commission [2] as authority for their argument that proof of reliance is not needed to support a fraud claim in an enforcement action under Section 4b(A) of the CEA. The plaintiffs further argue that this Court should look to securities case law under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder in interpreting Section 4b(A) of the CEA. The plaintiffs assert that it is well settled that the Securities and Exchange Commission need not show actual reliance to support a fraud claim in an enforcement action under Rule 10b–5 and likewise, the plaintiffs need not prove reliance in an enforcement proceeding under Section 4b(A).

In response the defendant argues that deference to Commission interpretation of the CEA is only appropriate where Congress has not spoken or has spoken ambig-

uously on the issue in question. The defendant asserts that the plain meaning of the words of Section 4b(A) make evident that Congress required proof of reliance in an enforcement action under this section and therefore, the Commission is not entitled to deference. The defendant further argues that the Commission decisions cited by the plaintiffs do not demonstrate a clear policy determination that proof of reliance is not required in an enforcement action under Section 4b of the CEA. Finally, the defendant argues that although the courts do recognize similarities between the securities and commodities laws, an independent analysis of Section 4b of the CEA makes clear that the concepts developed in cases under Rule 10b–5 and in the other cases cited by the plaintiffs are not relevant here.

 ■ I disagree with the defendant's assertion that Congress clearly and unambiguously required proof of reliance under Section 4b(A) by making it unlawful "to cheat or defraud or attempt to cheat or defraud" a person in connection with commodities transactions. 7 U.S.C. § 6b(A). Taken alone, the words of Section 4b(A) do not make clear whether Congress intended that reliance be an element in an enforcement action under this section. It would, accordingly, be appropriate for this Court to defer to Commission case law in interpreting Section 4b(A) if such case law demonstrated that the Commission had made a clear policy determination that proof of reliance is not required to support an enforcement action under Section 4b(A). *See Chevron, USA Inc. v. Natural Resource Defense Council, Inc.,* 467 U.S. 837, 843–844, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). However, none of the administrative cases cited by the plaintiffs directly or thoroughly address the issue of reliance in an enforcement action under Section 4b(A) of the CEA. For this reason I cannot base my decision on the Commission cases.

I am also not convinced by the plaintiffs' argument that I should look to securities case law under Rule 10b–5 in interpreting Section 4b(A) of the CEA. On its face, the

---

**2.** The Commodity Futures Trading Commission.

plaintiffs' analogy to decisions under Rule 10b–5 which hold that reliance need not be shown in an enforcement action since such actions are brought to protect the public and not to redress private wrongs is persuasive. Upon further consideration, I find myself in agreement with the defendant's argument distinguishing the language of Section 4b(A) from Rule 10b–5 [3]. Section 4o of the CEA makes it unlawful for commodity trading advisors and other commodity professionals "to employ any device, scheme or artifice to defraud" a client. The use of this language, which is identical to that in Rule 10b–5, is to be contrasted with Section 4b(A) which makes it unlawful "to cheat or defraud or attempt to cheat or defraud" another in connection with a commodities transaction. I agree with the defendant in as much as Congress was capable of adopting identical language if it so intended. From the divergent language of the two statutes I conclude that Congress did not intend for Section 4b(A) to be construed identically to Rule 10b–5.[4] For all the above stated reasons I will follow my earlier opinion and require the plaintiffs to establish reliance in making out their claim under Section 4b(A) of the CEA.

█ Next, the plaintiffs argue that I should adopt the standard for scienter under Section 4b(A) of the CEA that is set forth by the Commission in *Hammon v. Smith Barney, Harris Upham & Co. Inc.*, [1987–1990 Transfer Binder] Comm.Fut. L.Rep. (CCH) § 24,617 at 36, 659 (CFTC March 1, 1990), i.e., that the defendants acted with reckless disregard for their duties under the CEA. Section 4b(A) is ambiguous with respect to scienter and I may look to Commission decisions for guidance. *See Chevron, USA Inc. v. Natural Resource Defense Council*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

█ In my published Opinion I stated that, in making out a claim under Section 4b(A), the plaintiffs must establish that the defendants acted deliberately and with knowledge of the fraudulent nature of the false statements or omissions, but that the plaintiffs need not show that the defendants acted with an evil motive or an intent to injure. 693 F.Supp. at 194. I now hold that recklessness is sufficient to satisfy the scienter requirement of Section 4b of the CEA.[5] A reckless action, as the First Circuit said in reaching the same result in an appeal of a similar enforcement proceeding, "is one that departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing." *First Commodity Corp. of Boston v. Commodity Futures Trading Commission*, 676 F.2d 1, 7 (1st Cir.1982). I base my decision on the language of Section 4b [6], together with the recent decision of the Commission in *Hammon* and the various Courts of Appeals which have opined that reckless disregard of a statutory duty under the CEA is sufficient to establish scienter. *See Mayoza v.*

3. Rule 10b–5 reads in pertinent part:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national security exchange,
 (a) to employ any device, scheme, or artifice to defraud....
 17 C.F.R. 240.10b–5.
 Section 4o of the CEA reads in pertinent part:
 It shall be unlawful for any commodity trading advisor or commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
 (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant....
 7 U.S.C. § 6o (1988).

4. Congress was urged in the 1974 revision to modernize the language of Section 4b of the CEA. *See* Commodities Futures Trading Commission Act, Hearings on S. 2485 ... and H.R. 13113, Before the Sen. Comm. on Agric. and Forestry, 93rd Cong., 2d Sess. (1974) at 686–687 (Glenn Wilett Clark), 739 (Roy W. Schotland). Congress chose to preserve the language which originated largely in 1936. Congress was also urged to coordinate Section 4b(A) 'cheat or defraud ...' with the 10b–5 like phraseology of Section 4o(1). This suggestion was also declined. *Id.* at 718, 729 (Jerome P. Weiss).

5. Congress, of course, may act to clarify or change its original intent regarding this issue.

6. Congress did not use the words intentionally or knowingly anywhere in Section 4b.

*Heinold Commodities, Inc.,* 871 F.2d 672, 679 (7th Cir.1989); *Drexel Burnham Lambert Inc. v. Commodity Futures Trading Commission,* 850 F.2d 742, 748 (D.C.Cir. 1988); *First Commodity Corporation of Boston v. Commodity Futures Trading Commission,* 676 F.2d 1, 6 (1st Cir.1982); *Commodity Futures Trading Commission v. Savage,* 611 F.2d 270 (9th Cir. 1979).[7]

Having determined that the plaintiffs must establish reckless disregard of a statutory duty and reliance as the second and fourth elements of a claim under Section 4b(A) of the CEA, I will address the merits of the plaintiffs' claim. With regard to the first element, there is no genuine issue of material fact that in connection with an order to make a contract of sale of a commodity for future delivery the defendants made material representations of existing or past facts. The defendants' misrepresentations are apparent from the face of the AME Brochure that was used by the defendants to promote the Equity Building Program. *See* Deposition of Robert Maxwell, dated August 7, 1990, at 207 & Exhibit 59; Deposition of Bill Frank, dated August 22, 1990, Exhibit 3. The AME Brochure describes the Equity Building Program and the alleged risk free nature of the investment. Undoubtedly, the statements listed in the AME Brochure embody representations that would be important to a reasonable investor. For instance, the AME Brochure describes the defendants' expertise, their ability to fulfill the contracts, the relatively risk-free nature of the investment and its profitability. *See* AME Brochure; *Commodity Futures Trading Commission v. American Metal Exchange Corp.,* 693 F.Supp. at 194. However, the AME Brochure contains significant omissions and misrepresentations with respect to AME's experience in the precious metals business, fees associated with the Equity Building Program and the security of the clients investment. *Id.* at 184–185. This element is not disputed by any defendant.

Second, I must determine whether the plaintiffs have established the requisite scienter on the part of the defendants to find them liable under Section 4b(A) of the CEA. The plaintiffs argue that both the direct evidence of Mr. Maxwell's involvement in the fraud perpetrated on investors and his complete domination and control over Anglo–Swiss, AME and Amalgamated establish the necessary scienter for this Court to find Mr. Maxwell liable under Section 4b(A) of the CEA. In response, the defendant argues that there is a genuine issue of material fact with respect to Mr. Maxwell's understanding of and involvement in the preparation of the AME Brochure and its contents. The defendant also argues that there is a genuine issue of material fact as to Mr. Maxwell's involvement in and knowledge about the daily operations of AME. The defendant asserts that Mr. Maxwell's involvement in Anglo–Swiss and Amalgamated does not establish his knowing participation in a scheme to defraud.

Mr. Maxwell has come forward with an affidavit stating that he was merely an investor in AME, *See* Affidavit of Robert Maxwell, dated January 6, 1990, ¶¶ 6–9, that he was only a 25.01% shareholder in Anglo–Swiss, *Id.* at ¶ 10, that the futures contracts at issue were sold by others, such as AME, TWM, FC & M, Bill Frank, and Michael Jebrock, *Id.* at ¶¶ 8, 11–13, that he did not maintain daily contact with Bill Frank, *Id.* at ¶ 22, and that he was not involved in the development of the Brochure. *Id.* at ¶ 23.

On the other hand, Mr. Maxwell does not dispute that he agreed to contribute, along with two of his business partners, $5,000,-000 toward the capitalization of AME, *See* 693 F.Supp. at 174, that his 25% interest in Anglo–Swiss was as great or greater than any other individual, *Id.* n. 4, that Mr. Maxwell received approximately a half a million dollars in "personal loans" from AME, *Id.* at 179–180 & n. 26, and that Mr. Maxwell was the last person to review the

---

**7.** As several courts have noted, however, the Supreme Court has not specifically endorsed this view. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976).

AME brochure before it was deemed final. *See* Affidavit of William Maderer, filed January 29, 1990 ¶ 14 and Exhibit 14. Significantly, Mr. Maxwell admits that he signed all the liquidation checks that were supplied to investors from the sales of futures contracts by AME, *See* Affidavit of Robert Maxwell, dated January 6, 1990, ¶ 34, and Mr. Maxwell does not dispute that he was listed as the contact for investors seeking to liquidate their future contracts. *See* 693 F.Supp. at 178.

At his deposition, Michael Jebrock stated that although he did not know whether Mr. Maxwell was a shareholder or officer of AME "I know he controlled the company." All management, accounting and legal decisions pertaining to AME were supposed to be made in Mr. Maxwell's offices. Mr. Jebrock stated that all offices of AME were responsible to report to Mr. Maxwell as to all operations. In fact, Mr. Maxwell monitored the operations of AME himself. Carol Kahan, who was hired by Mr. Maxwell as his personal assistant, stated during her deposition that Mr. Maxwell required her to contact AME on a daily basis regarding closing prices on the metals market, AME's sales figures, contracts sold, value of the contracts and money received. 693 F.Supp. at 175.

Based on the facts set forth above, I conclude that Mr. Maxwell had control over the affairs of AME. Although Mr. Maxwell disputes these findings in conclusory terms in his affidavit, he has failed to proffer any specific facts to support a finding that Mr. Maxwell did not understand or control the daily business operations of AME. Mr. Maxwell's honest belief that the enterprise would ultimately make money cannot justify baseless, false or reckless misrepresentations or promises made by AME while under his control. A careful consideration of the facts and circumstances of this case makes a finding of reckless behavior on the part of the defendant Robert Maxwell inevitable.

■ The factual evidence presented to this Court also establishes the requisite scienter on the part of the defendant Bill Frank. In my earlier Opinions I found that

futures contracts were directly sold by Bill Frank. *See* 693 F.Supp. at 174–175; Summary Judgment Opinion, dated March 12, 1990 at 9. In a related proceeding, *State of New Jersey v. Bill Frank*, after a jury trial in the Superior Court of New Jersey, Law Division, Mr. Frank was found guilty of, *inter alia*, third degree sale of unregistered securities under N.J.S.A. 49:3–60 & 2C:2–7, second degree conspiracy under N.J.S.A. 2C:5–2, second degree theft under N.J.S.A. 2C:20–9 & 2C:2–7, and second degree theft by deception under N.J.S.A. 2C:20–4 & 2C:2–7. In pertinent part, N.J.S.A. 2C:20–4 reads:

*Theft by deception*

A person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely:

a. Creates or reinforces a false impression, including false impression as to law, value....

b. Prevents another from acquiring information which would affect his judgment of a transaction; or

c. Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

N.J.S.A. 2C:20–4 (1989).

■ A prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding. The standard for determining whether the litigation of a question in a civil suit is barred by a prior criminal trial is whether the question was "distinctly put in issue and directly determined in the criminal prosecution.... In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." *Kauffman v. Moss*, 420 F.2d 1270, 1274 *cert. denied* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970), *citing Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951). Here, the issue of scienter was determined by the jury's find-

ing that Mr. Frank purposely obtained property of another through misrepresentations in the sale of illegal futures contracts.

Based on the above stated facts and the prior criminal conviction, I find that Mr. Frank participated with reckless disregard for his duties under the CEA in a scheme to defraud in connection with the sales of illegal futures contracts.

 With respect to the defendant Michael Jebrock, this Court found that Mr. Jebrock participated in the sale of illegal futures contracts. Summary Judgment Opinion, dated March 12, 1990 at 11. Mr. Jebrock was the president and sole owner of TWM and controlled its daily operations. Approximately 78% of the Equity Building Program contracts were sold by TWM. *See* 693 F.Supp. at 176–177; Affidavit of William Maderer, filed January 29, 1990 ¶ 6 & Exhibit B. Despite Mr. Jebrock's contentions that he was never an employee of AME or Anglo–Swiss, Mr. Jebrock signed employment agreements with both AME and Anglo–Swiss, albeit the employment agreements are not executed by either corporate entity. 693 F.Supp. at 176. AME was located in the same location as TWM and this Court has previously found that Mr. Jebrock was perceived to be an officer of AME. *Id.* at 177. This Court also found that Mr. Jebrock was in daily contact with the New Jersey headquarters of AME as a consequence of his presidency of AME's largest sales agent TWM, as well as his role in AME itself. *Id.*

Based on the above stated facts, I find that Mr. Jebrock participated with reckless disregard for his duties under the CEA in a scheme to defraud in connection with the sales of illegal future contracts.

The plaintiffs have also established the third element of a Section 4b(A) violation. The defendants made material misrepresentations of fact in the AME Brochure about the Equity Building Program with respect to the defendants' expertise, their ability to fulfill the contracts, the relatively risk-free nature of the investment and its profitability, ostensibly to sell the Equity Building Program to potential investors. After a series of evidentiary hearings on March 28, 29, 30, 31, and April 4 and 5, 1988, I found that in addition to telephone solicitations, AME and its agents distributed the Brochure to every investor who expressed an interest in the Equity Building Program. *See* Affidavit of Bryan Clobis, Esquire, dated October 18, 1990 at ¶ 4; *Commodity Futures Trading Commission v. American Metal Exchange Corp.*, 693 F.Supp. at 179. No one has challenged this finding or attempted to raise an issue of fact in connection with regard to it. I accordingly find that there is no genuine issue of material fact that the AME Brochure, which contained material misrepresentations of fact, was distributed by the defendants with the intent that potential investors would rely on it and decide to invest in the Equity Building Program.

 Finally, I find that the plaintiffs have established the fourth element of a Section 4b(A) violation. The evidence establishes that the defendants sold the Equity Building Program to potential investors by misrepresenting the profitability, cost and risk-free nature of the investment. The purchasers inevitably relied on these representations to their detriment. 693 F.Supp. at 194–195.

Having found that summary judgment should be granted as to the defendants Robert Maxwell, Bill Frank and Michael Jebrock on Count II, I must determine whether similar relief should be granted as against the corporate defendants AME, Anglo Swiss, FC & M and Amalgamated.

 It is well accepted that the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation. *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884 (3rd Cir.1975). In my published Opinion, 693 F.Supp. 168 (D.N.J.1988), I found that the defendants Robert Maxwell, Bill Frank and Michael Jebrock participated in an illegal commodity futures scheme by way of their positions in the defendant corporations. As my findings of fact make evident, the individual

defendants were acting with actual authority and for the benefit of the corporate defendants in perpetrating the Equity Building Program. I will, accordingly, impute the fraud of the individual defendants to the defendant corporations and grant summary judgment against each of the corporate defendants on Count II.

Before considering Counts III through VIII, I must determine whether the plaintiffs Florida and New Jersey have jurisdiction to prosecute the defendants under state law. Put differently, I must determine whether the Commodity Futures Trading Commission has exclusive jurisdiction under the CEA to regulate trading in commodity futures.

*Jurisdiction*

In 1974 Congress created the Commodity Futures Trading Commission and granted it exclusive jurisdiction over commodities and futures trading. In the Future Trading Act of 1982, Congress amended the CEA to permit state regulation of commodities in certain contexts. *See* Futures Trading Act of 1982, Pub.L. No. 97–444, § 229, 96 Stat. 2294, 2318 (1983) (codified at 7 U.S.C. § 16(e)). As a result, the CEA now "does not supersede or preempt any Federal or State statute ... that is applicable to any transaction as to any commodity, that is not conducted on or subject to the rules of a contract market, or ... any board of trade, exchange, or market located outside the United States ..., or that is not subject to regulation by the Commission under section 4c (options transactions) or 19 (leverage transactions)." H.R.Rep. No. 565(I), 97th Cong., 2d Sess. 104, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3871, 3953.

■ While exclusive jurisdiction of the Commodity Futures Trading Commission has been retained in regulation of the Nation's commodity exchanges and regulation of authorized commodity options programs and leverage contracts, an "open season" was declared on commodities fraud by authorizing state officials to apply any state or federal law against persons engaged in "off-exchange" commodities trading. Inasmuch as this case involves off-exchange trading, the plaintiffs Florida and New Jersey may pursue summary judgment on Counts III through VIII establishing first that it was the intent of the state legislature to regulate commodities, and second that there are no questions of material fact as to whether the Equity Building Program violates state law.

*II. Motion for Summary Judgement Against All Defendants on Count III of the First Amended Complaint*

The plaintiffs have moved for summary judgment on Count III of the First Amended Complaint for Injunctive and Ancillary Equitable Relief under N.J.S.A. 49:3–60 (1989). The plaintiffs request such relief against all of the defendants. Robert Maxwell is the only defendant who has opposed this motion

*Liability*

N.J.S.A. 49:3–60 provides, in pertinent part, that it is unlawful for any security to be offered or sold in New Jersey unless: (a) the security or transaction is exempt from registration; (b) the security or transaction is not subject to, or is exempt from the registration requirements of the Securities Act of 1933; or (c) the security is registered.

■ As an initial matter, the plaintiffs contend that the Equity Building Program falls within the definition of a security under New Jersey law. Specifically, the plaintiffs argue that the Equity Building Program is an investment contract as that term is defined in N.J.S.A. 49:3–49(m) (1989). The plaintiffs argue that this Court should look to federal and state precedent in interpreting the New Jersey Uniform Securities Act[8], N.J.S.A. 49:3–47 *et seq.* (1989), and that the Equity Building Program meets the four prong definition of an

---

**8.** The plaintiffs base their argument on the statutory policy of the Uniform Securities Act as set forth in N.J.S.A. 49:3–75 (1989) which reads:
This law shall be so construed as to effectuate its general purpose to make uniform the law of those States which enact similar laws and to coordinate the interpretation and administration of this law with related Federal regulations.

investment contract under applicable case law.

In response the defendant argues that, in light of New Jersey's posture that it is guided by federal securities law, New Jersey is barred from utilizing state law to regulate the Equity Building Program. Under federal law, argues the defendant, commodities are subject to the exclusive jurisdiction of the Commodity Futures Trading Commission and application of the CEA precludes application of other securities laws.

I disagree with the defendant's assertion that New Jersey is barred from utilizing state securities law to regulate the Equity Building Program. The Uniform Securities Act was passed by the New Jersey legislature in 1967. At that time, the Securities and Exchange Commission and the state securities commissioners actively regulated commodity futures under securities law. It was not until 1974 when Congress substantially amended the CEA and created the Commodity Futures Trading Commission, that the Commission was given exclusive jurisdiction over the regulation of commodity futures. Russo & Lyon, *The Exclusive Jurisdiction of the Commodity Futures Trading Commission,* 6 Hofstra L.Rev. 57 (1977). The exclusive jurisdiction of the Commodity Futures Trading Commission ended in 1982. Although it is true that the New Jersey legislature did not amend the Uniform Securities Act or enlarge its definition of a security to encompass commodity futures in response to the Futures Trading Act of 1982, the definition of security under the Act has remained essentially the same since 1967 when commodity futures were regulated under the Uniform Securities Act. Given these facts, I can only conclude that the New Jersey legislature intended to regulate commodity futures under the New Jersey Uniform Securities Act.

Having concluded that the New Jersey legislature intended to regulate commodity futures under New Jersey Uniform Securities Act, I now hold that the Equity Building Program fits within the definition of investment contract under

N.J.S.A. 49:3–49(m) (1989). Under New Jersey law, an investment contract is defined as a transaction "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *AMR Realty Corp. v. State Bureau of Securities,* 149 N.J.Super. 329, 373 A.2d 1002, *appeal after remand* 153 N.J.Super. 84, 379 A.2d 59 (1977) *citing Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Similarly, federal precedent defines an investment contract as comprising (1) the presence of an investment (2) in a common venture (3) premised on a reasonable expectation of profits (4) that are derived from the entrepreneurial or managerial efforts of others. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

First, the plaintiffs have established that there were both offers and sales of Equity Building Program contracts in New Jersey. This Court previously found that from May of 1986 through June of 1987, approximately 2,000 investors purchased Equity Building Program contracts. *See* 693 F.Supp. at 178.

Second, in this Circuit to satisfy the common venture element the plaintiffs must show that funds were pooled and that the fortunes of each investor in the pool were tied to the success of the overall venture. *Salcer v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 682 F.2d 459, 460 (3rd Cir.1982). The Equity Building Program was operated by placing the major portion of clients' down payments in government-backed securities and large omnibus hedging accounts which were to be maintained on the leading commodity futures exchanges. *See* 693 F.Supp. at 179; AME Brochure; Deposition of Bill Frank, dated August 22, 1990 at 194–195. These pooled funds were to be maintained in government-backed securities and large omnibus trading accounts to assure availability of metals for delivery at the inves-

tor's request. Upon liquidation AME was to obtain the metal, sell it to Amalgamated on behalf of the investor with Amalgamated taking physical delivery. 693 F.Supp. at 182 n. 35. Given this Court's findings of fact regarding the structure of the Equity Building Program, I conclude that the Equity Building Program involved an investment in a common venture.

Third, I find that the investors in the Equity Building Program reasonably expected to profit from their investment in the Equity Building Program. This is self-evident from the face of the AME Brochure which describes the alleged risk free nature of the investment. *See* 693 F.Supp. at 179; AME Brochure.

Fourth, I find that investors in the Equity Building Program would derive profits, if at all, solely from the entrepreneurial or managerial efforts of others. Once an investor in the Equity Building Program made a down payment, the only other role that investor could play would be to chose to liquidate the contract or take delivery of metal. *See* Deposition of Robert Maxwell, dated August 7, 1990 at 196 & Exhibit 58. In fact, physical delivery of metals rarely occurred. *See Id.;* Deposition of Bill Frank, dated August 22, 1990 at 146; 693 F.Supp at 180–182.

▪ Having determined that the Equity Building Program satisfies the four prong definition of an investment under N.J.S.A. 49:3–49(m), I will address the merits of the plaintiffs claim under N.J.S.A. 49:3–60 (1989). As I stated earlier, N.J.S.A. 49:3–60 prohibits the offer or sale of unregistered, non-exempt securities or investments in New Jersey. The plaintiffs have established that there were both offers and sales of Equity Building Program contracts in New Jersey. This Court previously found that from May of 1986 through June of 1987, approximately 2,000 investors purchased Equity Building Program contracts. *See* 693 F.Supp. at 178. Second, the Equity Building Program contracts

were never registered or found to be exempt from registration by the New Jersey Bureau of Securities. *See* Affidavit of James R. Stephens, dated October 15, 1990. Third, all but one of the defendants directly participated in the sale of Equity Building Program contracts in New Jersey.

Robert Maxwell plead guilty to one count of the sale of an unregistered security under N.J.S.A. 49:3–60, N.J.S.A. 49:3–70, N.J.S.A. 2C:2–7, and N.J.S.A. 2C:2–6. *See* Appendix in Support of the Plaintiffs Motion for Summary Judgment, Exhibit B at 9. During his allocution Mr. Maxwell stated that he was an investor in and stockholder of AME and that he was aware that AME sold the Equity Building Program contracts in New Jersey from May 1986 through June 1987. Mr. Maxwell stated that he was aware that AME was not registered in New Jersey. Mr. Maxwell also stated that he did not dispute the State's position that the Equity Building Program was a security. *Id.* Further, this Court previously found that Mr. Maxwell made the ultimate decisions as to the contents and design of the AME Brochure which was used to promote the Equity Building Program and given to all potential investors. 693 F.Supp. at 179.

The corporate defendant AME plead guilty to the sale of unregistered securities under N.J.S.A. 49:3–60, N.J.S.A. 49:3–70, N.J.S.A. 2C:2–7, and N.J.S.A. 2C:2–6.[9] *See* Appendix in Support of the Plaintiffs Motion for Summary Judgment, Exhibit E. The corporate defendant Anglo–Swiss was incorporated in the Republic of Panama on June 9, 1986, for the explicit purpose of ownership of AME. The corporate defendants Transworld and FC & M were the sales agents through which AME sold the Equity Building Program. *See* 693 F.Supp. at 173, 176.

Michael Jebrock was president and 100% owner of Transworld and controlled its daily operations. Approximately 78% of the Equity Building Program contracts sold to

---

**9.** AME plead guilty to eight counts of a fourteen count indictment including conspiracy, second degree theft, second degree theft by deception, theft by deception, failure to file a corporate tax return, third degree sale of unregistered securities, and two counts of third degree securities fraud. *See* Appendix in Support of the Plaintiffs Motion for Summary Judgment, Exhibit E.

the public were sold by Transworld. 693 F.Supp. at 176–177. The evidence suggests that Mr. Jebrock both functioned as an officer of AME and was perceived as such. *Id.* at 177. Indeed, Mr. Jebrock was in daily contact with the New Jersey headquarters of AME as a consequence of his presidency of AME's largest sales agent as well as his role in AME itself. *Id.*

Bill Frank was found guilty by a jury the sale of unregistered securities under N.J.S.A. 49:3–60, N.J.S.A. 49:3–70, N.J.S.A. 2C:2–7, and N.J.S.A. 2C:2–6.[10] *See* Appendix in Support of the Plaintiffs Motion for Summary Judgment, Exhibit G.

■■■■■ Although there is no evidence to support a finding that Amalgamated directly sold unregistered securities in New Jersey, I find Amalgamated liable under N.J.S.A. 49:3–60 as an aider and abettor and conspirator.[11] Secondary liability for securities violations can be imposed under these common law concepts. *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880 (3rd Cir.1975). To impose liability as an aider-abettor the plaintiffs must establish three elements: (1) the existence of an independent wrongful act; (2) knowledge by the aider and abettor of that wrongful act; and (3) substantial assistance in effecting that wrongful act. *Landy v. Federal Deposit Insurance Corporation,* 486 F.2d 139, 162–163 (3rd Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). Put differently, the person who is primarily liable must have violated a securities law, and the alleged aider and abettor must have known of this violation and by his conduct substantially assisted the primary violator in carrying out the unlawful scheme. 2 Bromberg, *Securities Law* §§ 8.5 & 208.45 (1971). Mr. Maxwell controlled Amalgamated, a New York corporation established to act as an independent third party agent for liquidating the Equity Building Program contracts. 693 F.Supp

at 177. In view of Amalgamated's role in the Equity Building Program and its association with Mr Maxwell, I find Amalgamated liable as an aider and abettor for violation of N.J.S.A. 49:3–60.

For all the above stated reasons I will grant summary judgment against each of the defendants on Count III.

*III. Motion for Summary Judgment Against All Defendants on Count IV of the First Amended Complaint*

The plaintiffs have moved for summary judgment on Count IV of the First Amended Complaint for Injunctive and Ancillary Equitable Relief under N.J.S.A. § 49:3–56 (1989). The plaintiffs request such relief against each of the defendants. Robert Maxwell is the only defendant who has opposed this motion.

■■■ N.J.S.A. 49:3–56 provides, in pertinent part, that it is unlawful for any person to act as a broker-dealer, agent or investment advisor in New Jersey unless he is registered under the Uniform Securities Act. Section 49:3–56 also provides that it is unlawful for any broker-dealer or issuer to employ an agent in New Jersey unless the agent is registered under the Uniform Securities Act. As defined in N.J.S.A. 49:3–49(c), the term broker-dealer means any person engaged in the business of effecting or attempting to effect transactions in securities for the account of others or for his own account. The term agent is defined in N.J.S.A. 49:3–49(b) as any individual other than a broker-dealer who represents a broker-dealer or issuer in effecting or attempting to effect the purchase or sale of securities. Put simply, a violation of Section 49:3–56 is established by demonstrating that an unregistered person engaged in the business of effecting or attempting to effect transactions in securities for the account of others or for his own account.

---

10. The jury found Mr. Frank guilty of six counts of a fourteen count indictment including second degree conspiracy, two counts of second degree theft, second degree theft by deception, failure to file a corporate tax return, third degree sale of an unregistered security. *See* Appendix in

Support of the Plaintiffs Motion for Summary Judgment, Exhibit G.

11. Amalgamated plead guilty to four counts of a fourteen count indictment including conspiracy, two counts of theft by deception, and securities fraud.

■ First, as discussed *infra* the Equity Building Program contracts are investments under the New Jersey Uniform Securities Act. Second, none of the defendants are registered with the New Jersey Bureau of Securities. Third, except for Amalgamated, all of the defendants directly offered or sold Equity Building Program contracts in New Jersey. With regard to Amalgamated, in my discussion of Count II *infra* I found that Amalgamated aided and abetted the sale of securities in New Jersey. For all the above stated reasons I will grant summary judgment against each of the defendants on Count IV.

*IV. Motion for Summary Judgment Against All Defendants on Count V of the First Amended Complaint*

The plaintiffs have moved for summary judgment on Count V of the First Amended Complaint for Injunctive and Ancillary Equitable Relief under N.J.S.A. § 49:3–52 (1989). The plaintiffs request such relief against each of the defendants. Robert Maxwell is the only defendant who has opposed this motion.

N.J.S.A. § 49:3–52 provides, in pertinent part, that

[i]t shall be unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; [or]

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons.

N.J.S.A. 49:3–52 (1989).

The operative provision of N.J.S.A. § 49:3–52 was modeled after Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated by the Securities and Exchange Commission pursuant to the power conferred by Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988). *See* Comments to the Uniform Securities Act, 7A Uniform Laws Annot. at 568 (1978). Section 49:3–52 is virtually identical to Section 10(b) and Rule 10b–5 in imposing liability for fraud "in connection with the offer, sale or purchase of any security ... directly or indirectly." Given the identity of language between Rule 10b–5 and Section 49:3–52, I will use federal precedent construing Rule 10b–5 in deciding the plaintiffs' claim under Section 49:3–52. *See* N.J.S.A. 49:3–75 *infra* n. 9.

■ The elements of a claim under Rule 10b–5 include:

(1) a misstatement or omission made by the defendant in connection with the purchase or sale of a security. *Straub v. Vaisman & Co. Inc.*, 540 F.2d 591 (3rd Cir.1976);

(2) regarding a material fact. *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374 (2d Cir.) *cert. denied* 421 U.S. 976 [95 S.Ct. 1976, 44 L.Ed.2d 467] (1975);

(3) where the defendant had scienter to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 [96 S.Ct. 1375, 47 L.Ed.2d 668] (1976); and

(4) where there is reliance by the plaintiff. *Rochez Bros. v. Rhoades*, 491 F.2d 402 (3rd Cir.1974).

As an initial matter, the plaintiffs argue that this Court should follow other federal courts which have held that the Securities and Exchange Commission need not show reliance to support a fraud claim under Rule 10b–5. Put differently, the plaintiffs analogize to federal cases under Rule 10b–5 and argue that because actual damages need not be proven in an enforcement proceeding under N.J.S.A. 49:3–52, proof of reliance is not necessary to support their claim.

■ Various federal Courts of Appeal have taken the position that detrimental reliance is not material to a Rule 10b–5 enforcement action. *See Securities and Exchange Commission v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985) ("Unlike private litigants seeking damages, the Commission is

not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money."); *Securities and Exchange Commission v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 84–85 (2nd Cir.1970) ("[R]eliance is immaterial because it is not an element of fraudulent representation under Rule 10b–5 in the context of a Securities and Exchange Commission proceeding against a broker whether disciplinary ... or injunctive."); *Berko v. Securities and Exchange Commission*, 316 F.2d 137, 143 (2nd Cir.1963) ("[T]he fact that the salesman's clients were not misled and indeed may even have profited from his actions is legally irrelevant."). I see no reason to disagree with the accumulated wisdom of my colleagues. Accordingly, I hold that the plaintiffs need not establish actual reliance to support their claim under N.J.S.A. 49:3–52. Like an enforcement action under Rule 10b–5, this enforcement proceeding serves to protect the public interest, not to redress private wrongs. For these reasons, I find proof of reliance to be unnecessary to support an enforcement action N.J.S.A. 49:3–52 (1989).

Having concluded that the plaintiffs need not demonstrate reliance, I will address the merits of their claim under N.J.S.A. 49:3–52. With regard to the first and second elements, I find that each of the defendants made misstatements of material fact in connection with the purchase or sale of a security, as discussed in Counts 2 and 3 *infra*. I must, however, address the third element of scienter.

■ It is now well accepted that a plaintiff must show more than negligence to support a claim under Rule 10b–5. "Scienter—intent to deceive, manipulate or defraud—must be shown." *Harkavy v. Apparel Indus., Inc.*, 571 F.2d 737, 741 (2nd Cir.1978), *quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). The Supreme Court has not decided whether recklessness may support Rule 10b–5 liability. *Id.* at 194 n. 12, 96 S.Ct. at 1381 n. 12.

The various Courts of Appeals have considered the issue and have determined that reckless conduct is actionable under Section 10b–5. *Rolf v. Blyth Eastman Dillon & Co. Inc.*, 570 F.2d 38, 44–47 (2nd Cir.) *cert. denied* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Coleco Indus., Inc. v. Berman*, 567 F.2d 569, 574 (3rd Cir.1977) *cert. denied* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978); *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.1977) *cert. denied* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 (7th Cir.) *cert. denied* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Nelson v. Serwold*, 576 F.2d 1332, 1337–38 (9th Cir.) *cert. denied* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978). I now hold that recklessness is sufficient to support a claim under N.J.S.A. § 49:3–52.

■ Recklessness has been defined by the Third Circuit [12] as:

> highly unreasonable [conduct] involving not merely simple, or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*McLean v. Alexander*, 599 F.2d 1190, 1197 (3rd Cir.1979), *quoting Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). As with all judicial determinations of state of mind, a Rule 10b–5 plaintiff need not produce direct evidence. Circumstantial evidence may often be the principal, if not the only, means of proving bad faith. A showing that the danger of misleading was so obvious that the actor must have been aware of it will suffice. *McLean v. Alexander*, 599 F.2d at 1198. *See also Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 648 (3rd Cir.1980) (holding that recklessness is not indifference to the consequences, but is relatively close to intentional misconduct).

---

12. The Third Circuit has approved of a recklessness standard of scienter under Rule 10b–5 with respect to both a material omission and a material misstatement of fact.

■ My discussion in Counts II and III *infra* of the defendants' roles in the Equity Building Program establishes that each participated with reckless disregard of their duty under the New Jersey Uniform Securities Act in a scheme to defraud in connection with the sale of illegal futures contracts. Accordingly, I will grant summary judgment against each of the defendants on Count V.

### V. Motion for Summary Judgment Against All Defendants on Count VI of the First Amended Complaint

The plaintiffs have moved for summary judgment on Count VI of the First Amended Complaint for Injunctive and Ancillary Equitable Relief under Fla.Stat. §§ 517.-301(1) and 517.312(1)(a) (Westlaw 1991). The plaintiffs request such relief against each of the defendants. Robert Maxwell is the only defendant who has opposed this motion.

#### Liability

■ Section 517.312(1) provides that:

(1) It is unlawful and a violation of this chapter for any person:

(a) To offer or sell, in this state or from this state, any security or investment when such offer or sale is in violation of s. 517.301 or s. 517.311....

Fla.Stat. § 517.301(1)(a) (Westlaw 1991).

Section 517.301(1) [13] provides that:

(1) It is unlawful and a violation of the provisions of this chapter for a person:

(a) In connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction

exempted under the provisions of s. 517.-061, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;

2. To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3. To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

Fla.Stat. § 517.301(1) (Westlaw 1991).

As an initial matter, I must determine whether it was the intent of the Florida Legislature to regulate commodities trading under Chapter 517, Florida Statutes. In 1984, Florida amended its anti-fraud provisions by adding Fla.Stat. § 517.275 which makes it unlawful to violate the CEA within the state. Also in 1984, Florida amended Fla.Stat. § 517.301 to apply to "investment[s]" and changed the title of Chapter 517 from the Florida Securities Act to the Florida Investor Protection Act. In view of these legislative changes, I find that it was the intent of the Florida legislature to regulate commodities trading under Chapter 517, Florida Statutes. [14]

■ Next, I must determine whether the Equity Building Program falls within either of the statutorily defined terms investment or security. The plaintiffs argue that the Equity Building Program is an investment as defined in Fla.Stat. § 517.-301(2) (Westlaw 1991).

Section 517.301(2) provides that:

With respect to commodities, there is no Florida law specifically regulating or governing these transactions. This is because prior to the Future Trading Act of 1982 passed by Congress, regulation of commodities was the exclusive province of the federal government pursuant to the Commodity Exchange Act (7 U.S.C. ss. 1 et seq.). However, the Futures Trading Act of 1982 amended 7 U.S.C. s. 13a–2 to allow states to prosecute and enjoin violators of the Commodity Exchange Act.
Florida House of Representatives, Bill Analysis, House Bill 797, dated March 15, 1984 at 1 & 2.

**13.** This Section was relettered and renumbered effective October 1, 1986 but the wording remained the same.

**14.** My findings as to the Florida Legislature's intent are further supported by the Bill Analysis which states in pertinent part:

There is currently no law in Florida addressing boiler room solicitations. We do have laws governing ... fraudulent practices (Chapter 817); and with respect to securities, laws prohibiting fraudulent transactions (s. 517.301) and false representations (s. 517.311)....

(2) For purposes of this section, s. 517.311, and s. 517.312, the term "investment" means any commitment of money or property principally induced by a representation that an economic benefit may be derived from such commitment....[15]

Fla.Stat. § 517.301(2) (Westlaw 1991).

 Under Florida law, the measure of the existence of a security or investment under Chapter 517, Florida Statutes is the three-pronged test set out by the United States Supreme Court in *Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *See Rudd v. State,* 386 So.2d 1216, 1218 (Fla.App. 5th Dist.1980); *Brown v. Rairigh,* 363 So.2d 590 (Fla.App. 4th Dist. 1979); *Levine v. I.R.E. Properties, Inc.,* 344 So.2d 938 (Fla. 3rd Dist.1977). The *Howey* test requires that three elements be established: (1) an investment of money; (2) the existence of a common enterprise; and (3) an expectation of profits to be derived solely from the efforts of another. In applying this test, "form should be disregarded for substance and the emphasis should be on economic reality...." *Rudd v. State,* 386 So.2d at 1218. Inasmuch as I found that the Equity Building Program satisfies the *Howey* test in my discussion of Count III *infra,* I now hold that the Equity Building Program is an investment under Chapter 517, Florida Statutes.

Having determined that it was the intent of the Florida Legislature to regulate trading in commodity futures under Chapter 517, Florida Statutes, and that the Equity Building Program is an investment for purposes of Chapter 517, I will address the merits of the plaintiffs' claim.

 Florida's securities fraud statute requires that a plaintiff prove (1) a misrepresentation or omission; (2) of information material to the sales transaction; (3) upon which the purchaser reasonably relied; (4) that proximately caused his injury. *Alna Capital Associates v. Wagner,* 758 F.2d 562 (11th Cir.1985); *Zelman v.*

*Cook,* 616 F.Supp. 1121 (S.D.Fla.1985); *Alexander/Davis Properties, Inc. v. Graham,* 397 So.2d 699, 706 (Fla.App. 4th Dist. 1981); *Merrill Lynch, Pierce, Fenner & Smith v. Byrne,* 320 So.2d 436 (Fla.App. 3rd Dist.1975). The only difference in the proof required by the Florida securities fraud statute and Rule 10b–5 is in the level of scienter. A plaintiff must demonstrate reckless disregard in making out a claim under Rule 10b–5, whereas the Florida securities fraud statute merely requires a plaintiff to prove negligence. *Alna Capital Associates v. Wagner,* 758 F.2d at 566; *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 690–691 (11th Cir.1983).

My discussion in Counts II and III *infra* of the defendants' roles in the Equity Building Program establishes that each participated with reckless disregard of their duty under Sections 517.301(1) and 517.312(1)(a), Florida Statutes in a scheme to defraud in connection with the sale of illegal futures contracts. Accordingly, I will grant summary judgment against each of the defendants on Count VI.

### VI. Motion for Summary Judgment Against All Defendants on Count VII of the First Amended Complaint

The plaintiffs have moved for summary judgment on Count VII of the First Amended Complaint for Injunctive and Ancillary Equitable Relief under Fla.Stat. § 517.312(1)(b) (West 1987). The plaintiffs request such relief against each of the defendants. Robert Maxwell is the only defendant who has opposed this motion.

Section 517.312(1) provides that:

(1) It is unlawful and a violation of this chapter for any person:

(a) To offer or sell, in this state or from this state, any security or investment when such offer or sale is in violation of s. 517.301 or s. 517.311; or

(b) To directly or indirectly manage, supervise, control, or own, either alone or in association with others, any boiler

---

**15.** Section 517.301(2) also lists exemptions to the statutory definition of investment. The burden of establishing the right to an exemption is on the party claiming the exemption. *See* Fla. Stat. § 517.171 (Westlaw 1991). None of the defendants have asserted the right to such an exemption. Therefore, I need not address the issue.

room in this state which sells or offers for sale any security or investment in violation of paragraph (a).

Fla.Stat. § 517.312(1) (Westlaw 1991).

Chapter 517, Florida Statutes defines a boiler room as "an enterprise in which two or more persons engage in telephone communication with members of the public using two or more telephones at one location, or at more than one location in a common scheme or enterprise." Fla.Stat. § 517.021(5) (Westlaw 1991).

■ A violation of Section 517.312(1)(b) is established by demonstrating (1) the offer or sale of an investment as that term is defined under Florida law; (2) that the offer or sale was made from a boiler room located in Florida; (3) that the offer or sale was in violation of Fla.Stat. § 517.301; and (4) that each defendant participated in the violation of Fla.Stat. § 517.301.

■ First, as discussed in Count II and III *infra*, the plaintiffs have established that the defendants offered and sold the Equity Building Program to the public. In addition, I found in Count VI *infra* that the Equity Building Program is an investment under Chapter 517, Florida Statutes. Second, in my published opinion I found that five sales agents of AME sold the Equity Building Program over the telephone through sales offices located in Florida. *See* 693 F.Supp. at 176 & n. 12 & 179. I further found that of the Equity Building Program contracts sold overall, 78 percent were sold by TWM whose offices were located at 311 University Drive, Coral Springs, Florida. *Id.* Third, I found in my discussion of Count VI *infra* that the plaintiffs had demonstrated a violation of Fla. Stat. § 517.301. Fourth, I further concluded in Count VI *infra* that each defendant participated in a scheme to defraud in connection with the sale of illegal futures contracts in violation of Fla.Stat. § 517.301.

For all the above stated reasons I will grant summary judgment against each of the defendants on Count VII.

*VII. Motion for Summary Judgment Against All Defendants on Count VIII of the First Amended Complaint*

The plaintiffs have moved for summary judgment on Count VIII of the First Amended Complaint for Injunctive and Ancillary Equitable Relief under Fla.Stat. § 517.275 (Westlaw 1991). The plaintiffs request such relief against each of the defendants. Robert Maxwell is the only defendant who has opposed this motion.

Section 517.275 provides that it is a violation of Chapter 517, Florida Statutes for:

[A]ny person to engage in any act or practice in or from this state, which act or practice constitutes a violation of any provision of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, or the rules and regulations of the Commodity Futures Trading Commission under that act upon the effective date of this act.

Fla.Stat. § 517.275 (Westlaw 1991).

Having previously found that each of the defendants violated the CEA Section 4a, *See* Summary Judgement Opinion dated March 12, 1990, and Section 4b, *See* Count II *infra*, I will grant summary judgment against each of the defendants on Count VIII.

*VIII. Motion for a Permanent Injunction Against All Defendants*

The plaintiffs have moved for permanent injunctive relief against each of the defendants. Robert Maxwell is the only defendant who has opposed this motion.

■ Permanent injunctive relief against future violations may be ordered where it is demonstrated that there is a reasonable likelihood of future violations. *Commodity Futures Trading Commission v. American Board of Trade, Inc.*, 803 F.2d 1242, 1251 (2nd Cir.1986); *Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979). To determine whether future violations are likely to occur, the Court should consider the totality of the circumstances. *Commodity Futures Trading Commission v. Skorupskas*, 605 F.Supp. 923, 943 (E.D.Mich.1985). A court may infer that future violations are likely from past con-

788

duct. Such inferences may be appropriate where the past violations were willful or where the defendant did not cease its illegal activity until an investigation was commenced. *See Securities and Exchange Commission v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100–1101 (2nd Cir. 1972).

■ In view of the fact that I have granted summary judgment against each of the defendants on Counts I through VIII of the First Amended Complaint, I now find that the plaintiffs have, concomitantly, demonstrated the likelihood of future violations to warrant permanent injunctive relief. The plaintiffs argue and I agree that the willful and egregious nature of the violations demonstrated in this summary judgment motion and the absence of recognition of wrongdoing by the defendants, particularly Mr. Maxwell, support the issuance of a permanent injunction. I will, accordingly, grant the plaintiffs' application for a permanent injunctive against each of the defendants.

### IX. Motion for the Release of Assets

■ The defendant, Robert Maxwell, has requested relief from this Court's Order freezing his assets. Specifically, Mr. Maxwell has moved for an allowance of reasonable attorney's fees and living expenses.

The burden is on the defendant, Robert Maxwell, to show that the Order freezing his assets should be modified to permit additional allowances. For instance, in *Federal Savings & Loan Ins. Corp. v. Dixon,* 835 F.2d 554 (5th Cir.1987), the defendants argued that an order freezing their past assets should be modified to permit payment of attorneys' fees. While the Court agreed that some allowance was necessary to permit the defendants to pay counsel, the Court held that "the burden, however, will be on the defendant to satisfy the Court that he can secure the services of an attorney *only if* assets subject to the freeze order are released." 835 F.2d at 565 (emphasis supplied).

In addition, as I have stated previously, in determining whether Mr. Maxwell will be entitled to relief from the freeze Order, I must balance the purpose of the Order against the needs and interests of the defendant. The freeze Order has been imposed to enhance the possibility of awarding complete relief to the many injured parties at the close of this litigation. *See* Opinion dated October 12, 1988 at 12.

At the present time, the value of the assets frozen by the Court for the benefit of the defendants' former clients is well short of the amount of losses suffered by those clients. I believe that it would be inequitable to further deplete the receivership estate to pay Robert Maxwell's attorneys' fees or additional living expenses. For these reasons I will deny the defendant, Robert Maxwell's motions for attorneys' fees and additional living expenses.